# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2654

_____

Ronald John Calzone

*Plaintiff - Appellant*

v.

Donald Summers, in his official capacity as Chairman of the Missouri Ethics Commission; Kim Benjamin, in her official capacity as Vice-Chairwoman of the Missouri Ethics Commission; George Ratermann, in his official capacity as Commissioner of the Missouri Ethics Commission; Wayne Henke, in his official capacity as Commissioner of the Missouri Ethics Commission; Sherman Birkes, in his official capacity as Commissioner of the Missouri Ethics Commission; Cheryl Walker, in her official capacity as Commissioner of the Missouri Ethics Commission; Elizabeth Ziegler, in her official capacity as Executive Director of the Missouri Ethics Commission

*Defendants - Appellees*[1]

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 10, 2018
Filed: November 28, 2018

_____

---

[1]Appellees Summers, Benjamin, Henke, Birkes, Walker, and Ziegler are automatically substituted for their predecessors under Federal Rule of Appellate Procedure 43(c)(2).

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Appellant Ronald John Calzone seeks a permanent injunction against the Missouri Ethics Commission (the "**Commission**") to prevent the Commission from enforcing against him Mo. Rev. Stat. §§ 105.470, 105.473 (together the "**Missouri Statutes**"),[2] which he claims violate his First Amendment right to freedom

_____

[2]Missouri Revised Statute § 105.470 provides in relevant part:

(5) "**Legislative Lobbyist**", any natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity, meets the requirements of any one or more of the following:
. . .
(c) Is designated to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity[.]

The pertinent sections of Missouri Revised Statute § 105.473 state:

1. Each lobbyist shall, not later than January fifth of each year or five days after beginning any activities as a lobbyist, file standardized registration forms, verified by a written declaration that it is made under the penalties of perjury, along with a filing fee of ten dollars, with the commission. The forms shall include the lobbyist's name and business address, the name and address of all persons such lobbyist employs for lobbying purposes, the name and address of each lobbyist principal by

of speech. We disagree and affirm the district court's[3] denial of the permanent injunction.

## I. Background

Calzone is the incorporator, president (the sole officer), director, registered agent, and one of three members of the Board of Directors (the "**Board**") of Missouri First, Inc. ("**Missouri First**"). Missouri First is a non-profit organization, and its charter states that it uses legislative lobbying to influence public policy, mobilize the public, and meet Missouri First's objectives. R. Doc. 34, at 4. On its website, it also states that "there is strength in numbers" when lobbying and solicits new members to help further advance Missouri First's legislative agenda. R. Doc. 34, at 5.

Calzone regularly meets with legislators, legislative staff, and other legislative groups to discuss Missouri legislation. These meetings cover both specific legislation or proposed legislation and include Calzone and Missouri First's opinion as to whether legislation should be passed or blocked. Calzone admits that when he met with legislators in Jefferson City, Missouri, he usually disclosed his affiliation with

---

whom such lobbyist is employed or in whose interest such lobbyist appears or works.

. . .

3. (1) During any period of time in which a lobbyist continues to act as an executive lobbyist, judicial lobbyist, legislative lobbyist, or elected local government official lobbyist, the lobbyist shall file with the commission on standardized forms prescribed by the commission monthly reports which shall be due at the close of business on the tenth day of the following month[.]

[3]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

-3-

Missouri First, commonly by identifying himself as "Ron Calzone, Director of Missouri First" or "Ron Calzone, a director of Missouri First." R. Doc. 34, at 5. As the Director, sole officer, registered agent, and board member of Missouri First, Calzone is responsible for determining who will appear before the legislature and present Missouri First's agenda. No evidence in the record suggests that anyone other than Calzone has represented Missouri First before the Missouri legislature. Calzone does not receive any compensation or make any expenditures when lobbying on behalf of Missouri First.

In 2014 and 2016, the Commission received two complaints against Calzone claiming that he violated the Missouri Statues, which define who qualifies as a lobbyist and require those individuals to register as lobbyists and file regular lobbying reports. The Missouri Society of Governmental Consultants filed the first complaint, and the Commission found probable cause to believe that Calzone violated the lobbying statutes. Calzone appealed the decision, and the Administrative Hearing Commission ordered discovery. Calzone then sought a writ of prohibition from the Cole County, Missouri Circuit Court. The circuit court granted the petition, finding that the Missouri Society of Governmental Consultants is a corporation, and Missouri law does not allow corporations to file complaints with the Commission. The Commission appealed and the Missouri Court of Appeals reversed and remanded with directions to quash the writ. The Administrative Hearing Commission then stayed the proceedings pending this court's decision. The second complaint was filed by Michael Reid, a natural person, and was substantively identical to the first. The Commission has dismissed the second complaint.

On October 21, 2016, Calzone filed suit in federal court stating the Commission violated his First Amendment rights and requesting a temporary restraining order to prevent the Commission from enforcing the Missouri Statutes against him or any other unpaid lobbyists. Initially, the district court abstained from hearing the case because the 2016 complaint was pending before the Commission,

-4-

but, after the Commission dismissed the complaint, the district court resumed the temporary restraining order proceedings. The court denied Calzone's request for a temporary restraining order, finding he was not likely to succeed on the merits.

Calzone also moved for a permanent injunction, challenging the constitutionality of the Missouri Statutes both facially and as applied to him. After a hearing, the court, applying exacting scrutiny, found that Missouri had a sufficiently important interest in governmental transparency and that requiring unpaid lobbyists to register with the government and file lobbying reports was substantially related to furthering that transparency interest. Thus, the court held Calzone's as-applied challenge failed.

The district court then turned to Calzone's facial challenge and found it lacking as well. The court determined that the word "designated" in the statute was not unconstitutionally vague because an ordinary person would have a reasonable opportunity to understand what the statute required. Because Calzone was the registered agent of Missouri First, the court reasoned, he had the authority to appoint himself as a lobbyist for Missouri First. The court held this action is within the plain meaning of the statute.

Thus, because the district court found both claims failed on the merits, it denied Calzone's request for a permanent injunction. Calzone now appeals.

## II. Discussion

We normally review the denial of a permanent injunction for abuse of discretion, Hinz v. Neuroscience, Inc., 538 F.3d 979, 986 (8th Cir. 2008); however, when "the determinative question is purely legal, our review is more accurately characterized as *de novo*." Entm't Software Ass'n v. Swanson, 519 F.3d 768, 771 (8th Cir. 2008) (internal quotation marks omitted) (finding de novo review appropriate for

-5-

grant of permanent injunction related to First Amendment suppression of speech claim). "[T]o obtain a permanent injunction[,] the movant must attain success on the merits[,]" and the district court must determine that on balance "the threat of irreparable harm to the movant, . . . the harm to the other party if the injunction is granted, . . . and the public interest" weigh in favor of issuing the injunction. Bank One, Utah v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999).

Calzone makes three separate claims on appeal. First, he argues that the district court erred by applying the wrong level of scrutiny to his constitutional claims. Second, he argues that Mo. Rev. Stat. § 150.473 is unconstitutional as applied to him. Finally, Calzone argues that Mo. Rev. Stat. § 150.470 is facially unconstitutional for vagueness. We address each issue in turn.

## A. Level of Scrutiny

As a preliminary argument, Calzone asserts that the district court did not apply the correct level of scrutiny, claiming that strict scrutiny rather than intermediate or exacting scrutiny applies. It does not.

In Citizens United v. FEC, the Supreme Court held that "[t]he Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." Citizens United v. FEC, 558 U.S. 310, 318 (2010). In Minnesota Citizens Concerned for Life, Inc. v. Swanson, we held that "'[l]aws that burden political speech are [generally] "subject to strict scrutiny," . . .' [b]ut this is not true when the law at issue is a disclosure law, in which case it is subject to '"exacting scrutiny."'" Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 874-75 (8th Cir. 2012) (en banc) (first alteration in original) (quoting Citizens United, 558 U.S. at 340, 366). Exacting scrutiny "requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." Id. at 875 (internal quotation marks omitted).

-6-

Calzone argues that the district court inappropriately relied on Citizens United for the level of scrutiny because that case concerned campaign finance whereas this case involves lobbying. Calzone makes an inappropriate distinction. Citizens United did involve campaign finance, but the Supreme Court referred to disclosure and disclaimer requirements generally, and it made no distinction between disclosure statutes in campaign finance versus lobbying cases. Citizens United, 558 U.S. at 366; see also Swanson, 692 F.3d at 875. Because the statute at issue here is a disclosure statute, we apply exacting scrutiny. Iowa Right To Life Comm., Inc. v. Tooker, 717 F.3d 576, 589 (8th Cir. 2013).

*B. As-Applied Challenge*

Next, Calzone argues that the district court erred when it found that, as applied to him, an uncompensated person, Mo. Rev. Stat. § 105.473 satisfied exacting scrutiny. The Missouri statute does not differentiate between paid and unpaid lobbyists.[4] Mo. Rev. Stat. § 105.470. Calzone asserts that Missouri only has a sufficient interest in having paid lobbyists register; thus, as applied to him, the statute is unconstitutional because he is unpaid. Again, "exacting scrutiny . . . requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." Swanson, 692 F.3d at 875 (internal quotation marks omitted). We turn first to whether Missouri has a sufficiently important governmental interest in having unpaid lobbyists register.

---

[4]For context, inclusion of both the uncompensated and those who make no expenditures in the definition of "lobbyist" or "lobbying" is not uncommon in the states of the Eighth Circuit. In addition to Missouri, Iowa, Nebraska, North Dakota, and South Dakota do not identify compensation or expenditures as essential elements of the statutory definition of lobbyist or lobbying. See Iowa Code Ann. § 68B.2.13; Neb. Rev. Stat. Ann. § 49-1434; N.D. Cent. Code Ann. § 54-05.1-02; S.D. Codified Laws § 2-12-1.

We do not, as both Calzone and the dissent urge, consider the application of this statute to unpaid lobbyists who make no expenditures related to lobbying efforts because this argument was not fairly raised before the district court. Calzone did not even raise it on appeal until oral argument, where he attempted to recast his claim as including an as-applied challenge to registration requirements for unpaid lobbyists who make no expenditures. Whether this narrower claim might have been successful is an interesting academic question, but Calzone forfeited any such claim in the district court and waived it on appeal.

Calzone's complaint alleged a cause of action under the First and Fourteenth Amendments, stating "specifically" that the state of Missouri violated his rights by seeking to apply the lobbying statutes to his "uncompensated policy conversations." R. Doc. 1, at 11. His motion for a preliminary injunction sought an order preventing Missouri from enforcing the lobbying statutes "against any individual that acts without being compensated" and "against those who act without being compensated." R. Doc. 2, at 2. The district court properly addressed the issue that Calzone raised. See R. Doc. 34, at 1 ("Calzone contends that Missouri cannot require him to register as a lobbyist . . . *because he is not paid to be a lobbyist* and Missouri's definition of lobbyist is unconstitutionally vague.") (emphasis added); id. at 8 ("Calzone requests a permanent injunction prohibiting Defendants . . . from enforcing or threatening to enforce the disclosure requirements . . . *against those who act without being compensated*.") (emphasis added) (internal quotation marks omitted). Calzone's stipulation and factual assertions that he does not make expenditures are not the same as a legal argument premised on that fact.

Further, in his brief on appeal, Calzone's "Statement of the Issues" raised only the same legal issue that he presented in the district court: "May the government, consistent with the First and Fourteenth Amendments to the United States Constitution, require *unpaid individuals* to comply with Missouri's registration and reporting regime for legislative lobbyists?" Appellant's Br. 1 (emphasis added). His

"Summary of the Case" likewise described the question presented as whether an individual may be regulated as a lobbyist "even if he acts solely *as an unpaid volunteer*." Id. at i (emphasis added). The summary objected to the district court's ruling that "Missouri could require *unpaid volunteers* to carry the same burdens as professional, *compensated* lobbyists." Id. (emphases added). Calzone's heading in the "Argument" section of his brief reads: "The district court erred in failing to apply strict scrutiny to Missouri's efforts to regulate *uncompensated volunteers* as lobbyists." Id. at 13 (emphasis added). Calzone's failure to include a narrower as-applied challenge in his statement of the issues waived the argument. United States v. O'Neal, 17 F.3d 239, 243 n.8 (8th Cir. 1994); United States v. Simmons, 964 F.2d 763, 777 (8th Cir. 1992). And even if the issue had been stated, a passing reference to the absence of lobbying expenditures in the argument section of his opening brief is insufficient to present a legal issue for review. Anderson v. Durham D & M, LLC, 606 F.3d 513, 515 n.2 (8th Cir. 2010).

Even where the record factually supports what might be a better legal argument for reversal, it is not our place to raise it for a litigant who forfeits and waives the contention. See, e.g., Carpenter v. United States, 138 S. Ct. 2206, 2272 (2018) (Gorsuch, J., dissenting). Deciding the case based on an argument that was not properly raised either in the district court or on appeal would be unfair to the district court, which had no occasion to decide it, and to the state of Missouri, which had no reason to address it. And with no adversarial briefing on the question, this court is not in a good position to ensure that it is resolved correctly. Of course, the "entire case is before us," post, at [3], but what constitutes the "entire case" depends on what arguments were properly preserved in the district court and properly raised on appeal. Accordingly, we analyze only the as-applied challenge as to unpaid lobbyists.

Before Citizens United and its progeny established the exacting review standard for disclosure statutes, this Court held that requiring lobbyists to register

-9-

their activities was a compelling state interest that satisfied the strict scrutiny standard. Minn. State Ethical Practices Bd. v. NRA, 761 F.2d 509, 512 (8th Cir. 1985) (per curiam) (finding that the NRA's "communication with lawmakers through an artificially stimulated letter campaign" was a lobbying activity and the state could require individuals running the campaign to register as lobbyists). Citing to United States v. Harriss, 347 U.S. 612, 625 (1954), we held that there is a vital national interest in requiring the disclosure of lobbying activities. NRA, 761 F.2d at 512. As we established earlier, the appropriate level of scrutiny is now exacting scrutiny, which is a lesser standard than strict scrutiny. Thus, rather than having a compelling interest, the government need only have a sufficiently important interest. See Swanson, 692 F.3d at 874-75. If the interest in lobbyists registering their activities is a compelling interest, then it is certainly also a sufficiently important interest.

However, Calzone argues that the interest in having lobbyists register should apply only to paid lobbyists. He asserts that we should distinguish Harriss and Minnesota State Ethical Practices Board v. NRA from this case because those cases dealt with paid lobbyists and the government does not have a sufficient interest in having unpaid lobbyists like him register. This is a novel argument that presents an issue of first impression in the federal courts. But, upon reviewing existing case law, we find that the government retains a sufficiently important governmental interest in registering lobbyists whether the lobbyist is paid or unpaid.

In NRA, we held that the activity that warranted requiring the NRA's executive director to register and report as a lobbyist was his mailing of letters to Minnesota residents urging them to vote a specific way. NRA, 761 F.2d at 511. It was because of this activity alone, not campaign contributions or the fact that the executive director was paid by the NRA, that we found the director needed to register as a lobbyist. See id.; see also Fla. Ass'n of Prof'l Lobbyists, Inc. v. Div. of Legislative Info. Servs., 525 F.3d 1073, 1080 (11th Cir. 2008) (per curiam) (holding that "the

state has a compelling interest in self-protection in the face of coordinated pressure campaigns directed by lobbyists . . . [and] allow[ing] voters to appraise the integrity and performance of officeholders and candidates, in view of the pressures they face" (internal quotation marks omitted)); SpeechNow.org v. FEC, 599 F.3d 686, 696 (D.C. Cir. 2010) (stating that "[b]ecause disclosure requirements inhibit speech less than do contribution and expenditure limits, the Supreme Court has not limited the government's acceptable interests to anti-corruption alone[,] [and] [i]nstead, the government may point to any sufficiently important governmental interest" (internal quotation marks omitted)).

The Commission argues that it has an interest in transparency, which includes avoiding the fact or even the appearance of public corruption and knowing who is attempting to influence legislators and public policy. This interest, it argues, transcends whether that person is being paid. We agree that transparency is a sufficiently important governmental interest to satisfy exacting scrutiny. Though the lobbyists may not be receiving money, unpaid lobbyists could still offer things of value to legislators, creating a sufficiently important governmental interest in avoiding the fact or appearance of public corruption. Furthermore, the government and the public have a sufficiently important interest in knowing who is pressuring and attempting to influence legislators, and the ability to pressure and influence legislators is not limited solely to paid lobbyists.

Next, we turn to the question of whether the registration requirements in Mo. Rev. Stat. § 105.473 are substantially related to Missouri's interest in transparency. "[T]here must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed. . . ." Swanson, 692 F.3d at 876 (internal quotation marks omitted). "Regulatory provisions no more than tenuously related to the substantial interests disclosure serves . . . fail exacting scrutiny." Id. (alteration in original) (internal quotation marks omitted). "[T]he

strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." Id. at 881 (internal quotation marks omitted).

In Swanson, we found that Minnesota's expenditure disclosure law "fail[ed] this test because its ongoing reporting requirement . . . [was] untethered from continued speech [and did] not match any sufficiently important disclosure interest." Id. at 876. We stated that "Minnesota [could] accomplish any disclosure-related interests—providing the electorate and shareholders information concerning the source of corporate political speech, deterring corruption, and detecting violations of campaign finance laws—[t]hrough less problematic measures, such as requiring reporting whenever money is spent . . . ." Id. at 876-77 (second alteration in original) (internal quotation marks omitted).

The regulation at issue here requires lobbyists to register each year that they plan to engage in lobbying activities, pay a $10 filing fee, and submit forms that include "the lobbyist's name and business address, the name and address of all persons such lobbyist employs for lobbying purposes, the name and address of each lobbyist principal by whom such lobbyist is employed or in whose interest such lobbyist appears or works." Mo. Rev. Stat. § 105.473(1). The statute additionally mandates that "[d]uring any period of time in which a lobbyist continues to act as a[] . . . legislative lobbyist . . . the lobbyist shall file with the commission on standardized forms prescribed by the commission monthly reports which shall be due at the close of business on the tenth day of the following month[.]" Id. § 105.473(3).

It is clear that the Missouri statute is directly related to Missouri's interest in knowing who is acting as a lobbyist to influence legislators and public policy and to avoid the fact or appearance of corruption. We further find that the burden of these requirements does not outweigh Missouri's interest in transparency. In fact, these requirements are minimal, imposing a very slight burden on those required to register

and report. The registration process takes little time, effort, and money to complete, and those requirements, respectively, need only be completed in the months or years in which Calzone actually engages in lobbying activities. Moreover, this legislative scheme is precisely that which we have previously held would satisfy the substantial relationship test. See Swanson, 692 F.3d at 876-77. Furthermore, Calzone would have an even easier time producing the lobbying reports than most because the reports simply require Calzone to make statements regarding expenditures related to his lobbying activities, Mo. Rev. Stat. 105.473(3), which he claims he does not engage in. Because the statute directly furthers Missouri's interest in transparency and the burden placed on Calzone is not disproportionate to that interest, we find that the statute is substantially related to Missouri's sufficiently important governmental interest. Therefore, we hold that Mo. Rev. Stat. § 150.473 is not unconstitutional as applied to Calzone.

## C. Facial Challenge

Finally, Calzone argues that Missouri's statute is facially unconstitutional because the word "designated" in the definition of a "legislative lobbyist" in Mo. Rev. Stat. § 105.470(5)(c) is vague.

"Facial challenges are disfavored . . . ." Phelps-Roper v. City of Manchester, 697 F.3d 678, 685 (8th Cir. 2012) (en banc). A successful facial challenge requires "establish[ing] that no set of circumstances exists under which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." Id. (internal quotation marks and citations omitted).

When "[c]onstruing a statute, [we] look[] first to its plain meaning." United States v. Berger, 553 F.3d 1107, 1109 (8th Cir. 2009). "A statute can be impermissibly vague . . . if it fails to provide people of ordinary intelligence a

-13-

reasonable opportunity to understand what conduct it prohibits . . . ." <u>Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon</u>, 428 F.3d 1139, 1143 (8th Cir. 2005) (quoting <u>Hill v. Colorado</u>, 530 U.S. 703, 732 (2000)). "[I]f from the plain meaning of the statute [legislative] intent is clear, except for rare instances, 'that is the end of the matter.'" <u>In re Old Fashioned Enters., Inc.</u>, 236 F.3d 422, 425 (8th Cir. 2001) (quoting <u>Chevron USA, Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842 (1984)).

The Missouri statute, in relevant part, defines a legislative lobbyist as:

[A]ny natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity, meets the requirements of any one or more of the following:
. . .
(c) Is designated to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity[.]

Mo. Rev. Stat. § 105.470(5).

Black's Law Dictionary defines "designate" as "choos[ing] (someone or something) for a particular job or purpose." <u>Designate</u>, Black's Law Dictionary (10th ed. 2014). Similarly, the Oxford English Dictionary defines "designate" as "[a]ppoint[ing] (someone) to a specified office or post." <u>Designate</u>, English Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/designate (last visited Oct. 2, 2018).

-14-

Calzone essentially argues that the term "designated" is vague because the Commission found that Calzone had been "designated" a lobbyist even though the Board had taken no official action to name him a lobbyist. We note that this argument appears to be another as applied challenge; however, Calzone insists that he is bringing a facial challenge and that the word "designated" is unconstitutionally vague. Accordingly, we will consider this claim as a facial challenge.

The term "designated" is clearly defined, and the statute uses the word within its plain meaning; thus, "people of ordinary intelligence" would have a "reasonable opportunity to understand" what "designated" means in the context of the statute. Reproductive Health Servs., 428 F.3d at 1143. Because the plain meaning of "designated" is clear and well understood, Missouri's legislative intent is also clear—anyone who has been chosen or appointed to lobby the legislature on behalf of a nonprofit corporation must register and report their activities. See Mo. Rev. Stat. §§ 105.470(5), 105.473. Calzone argues that, in his situation, legislative intent is unclear because the Board has taken no official steps to name him as a lobbyist for the organization. However, the statute neither requires specific official action, nor, contrary to Calzone's assertions, does it require any evidence of an official action to find that someone has been chosen as a lobbyist. Because "from the plain meaning of the statute [Missouri's legislative] intent is clear . . . 'that is the end of the matter.'" In re Old Fashioned, 236 F.3d at 425 (quoting Chevron, 467 U.S. at 842). Further, it is evident that Calzone is an appointed lobbyist for Missouri First. As the sole incorporator, director, president, agent, and board member of an organization whose stated intent is to use legislative lobbying to influence public policy, mobilize the public, and meet their objectives, Calzone asks us to reject common sense to find that he was not appointed to a position that involved lobbying the legislature—especially given Calzone's admission that he regularly disclosed his affiliation with Missouri First during meetings with legislators at the capitol.

Because Calzone's claims fail on the merits, it is unnecessary for us to address the other elements for a permanent injunction. See Guttau, 190 F.3d at 847-48. Accordingly, we find that Calzone is not entitled to a permanent injunction.

### III. Conclusion

For the foregoing reasons, we affirm.

STRAS, Circuit Judge, dissenting.

The government "depends upon the ability of the people to make their wishes known to their representatives." *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961). At the core of the First Amendment is the ability of all citizens to influence government through petitioning and speech. *See* U.S. Const. amend. I; *McDonald v. Smith*, 472 U.S. 479, 482 (1985) (explaining that "James Madison made clear in the congressional debate on the [First Amendment] that people may communicate their will" by petitioning and speaking to "the legislature and government officials" (internal quotation marks and citation omitted)).

Yet Missouri regulates these First Amendment activities as "lobbying," even if no money changes hands, precisely because they influence government. Missouri's lobbying-disclosure law crosses the constitutional line by burdening Calzone's core First Amendment activities without either adequate justification or narrow enough tailoring. I accordingly dissent.

I.

Missouri law treats Calzone as a lobbyist because he has been "designated . . . by . . . [a] nonprofit corporation" to act on its behalf "for the purpose of attempting

-16-

to influence" legislation. Mo. Rev. Stat. § 105.470(5)(c). But let us be clear about what, exactly, Missouri means by "lobbying." Calzone is a Missouri citizen who speaks to legislators. No one pays him to do so, and he does not pay anyone in connection with his activities. To be sure, Calzone created a nonprofit "alter ego," as Missouri characterizes it, to amplify his voice. But even so, Calzone is not who we typically think of as a lobbyist.

The court insists on ignoring the fact that Calzone does not spend money on his advocacy efforts based on a crabbed reading of his complaint and motion for injunctive relief. In my view, we cannot overlook Calzone's lack of expenditures because it has been a piece of his as-applied challenge to Missouri's lobbying-disclosure law all along.

The meat of Calzone's as-applied challenge has always been, as one might expect, that Missouri cannot constitutionally apply its registration and reporting requirements to *him*. It simply is not true, as the court claims, that Calzone raised the issue of expenditures for the first time at oral argument. Beginning with his appearance before the Missouri Ethics Commission and continuing with his complaint in the district court, memorandum in support of his motion for a permanent injunction, stipulation of facts, briefing to this court, and oral argument, the record is stuffed full of references to Calzone's lack of expenditures, leaving no doubt that a key piece of his argument is that he does not give money or gifts to legislators.[5] The

---

[5]*See, e.g.*, Transcript of Oral Argument at 12, *Calzone v. Mo. Ethics Comm'n*, No. 15-1450 EC (Mo. Admin. Hr'g Comm'n Feb. 3, 2016) ("[Calzone does not] dispute that someone who gives a gift to a legislator may be regulated as a lobbyist. That's simply not the case here."); Suggestions in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctive Relief at 1 ("[Calzone] does not provide gifts, meals, or anything of value to legislators or legislative staff in connection with his activism."); *id.* at 9 (arguing that the Missouri law is unconstitutional because it requires registration even for those who do not "receiv[e] any compensation and [who do not] expend[] any money"); *id.* at 11 (noting that

-17-

district court and Missouri were on notice that Calzone's constitutional argument folds in *both* his lack of compensation and his lack of expenditures, and so are we.

_____

Missouri's interest in identifying who is "putting up the money, and how much," is not served by forcing Calzone to register because he does not "spend money on legislators and legislative staff" (citation omitted)); Joint Stipulation at 1 ("Plaintiff does not make expenditures for the benefit of one or more public officials or one or more employees of the legislative branch of state government in connection with [speaking with legislators]."); Plaintiff-Appellant's Opening Brief at 2 (making clear that Calzone "does not make expenditures . . . in connection with" his advocacy activity (internal quotation marks omitted)); *id.* at 2–3 (same); *id.* at 11–12 (arguing that Missouri, in applying its law to him, has taken "the extraordinary position . . . that the receiving or spending of money is completely irrelevant to a person's status as a lobbyist"); *id.* at 19 (noting that Missouri requires registration of advocacy efforts divorced from any "monetary dimension whatsoever"); *id.* at 20 n.10, 21, 23–26, 25 n.13 (emphasizing that lobbyist-disclosure laws have been upheld in the past, but only as applied to individuals who have been hired to influence legislators or who spend money on their lobbying); *id.* at 26 (claiming that the district court erred "[b]y permitting the government to regulate Mr. Calzone—who was not hired, has not put up money, and has spent nothing to petition his government"); Plaintiff-Appellant's Reply Brief at 2 (noting that "there is not even a suggestion that Calzone gives gifts to legislators"); *id.* at 4–5 (arguing that the state's interest in combating corruption is not served by regulating an unpaid volunteer who does not "expend[] money . . . in connection with his political activism"); *id.* at 6 ("[T]his Court is not at liberty to extend the reasoning applied in *Harriss* to allow regulation of citizen activists whose political statements are completely unrelated to monetary expenditures."); *id.* at 10 (arguing that campaign-finance-disclosure cases are distinguishable, "especially on these facts," because here there is no "financial dimension"); *id.* at 12–14 (claiming that this case is distinguishable from constitutional applications of lobbyist-disclosure laws because here "there is no suggestion that a citizen is receiving or expending money to promote political ideas" and hence no concerns over corruption); *id.* at 15–16 (distinguishing an unpublished opinion from California because Calzone does not spend any money); *id.* at 17–18 (noting that a state's interest in combating corruption "must involve money," but Calzone is uncompensated and spends no money); *id.* at 19 (asserting that if an activist has not given "anything of value" to legislators, there can be "no suggestion of *quid pro quo*" corruption).

Just because Calzone's lack of compensation is the lede does not mean that we get to bury the rest of the story.

The procedural posture provides us with yet another clue about the scope of our review. The district court's denial of a permanent injunction is just one ingredient of Calzone's appeal. The other is the court's decision to enter final judgment against him. By dismissing Calzone's complaint, the court rejected his request for a declaration that Missouri's lobbying-disclosure law is unconstitutional as applied to him, an individual who, as his complaint makes clear, neither is paid nor pays anyone else in connection with his advocacy. *See* Verified Complaint 1, 12 (stating that "[Calzone] does not give legislators any gifts" and requesting declaratory relief). The entire case is accordingly before us, not just Calzone's unsuccessful motion for a permanent injunction and not just the narrow issue the court addresses.

II.

Turning to the merits of Calzone's First Amendment challenge, the court would apply exacting scrutiny because Missouri's law calls for disclosure. Exacting scrutiny "requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874–75 (8th Cir. 2012) (en banc) (internal quotation

marks and citation omitted).[6]  "Though possibly less rigorous than strict scrutiny, exacting scrutiny is more than a rubber stamp."  *Id.* at 876 (citations omitted).

Missouri defends its right to regulate Calzone's activities based on a desire for transparency.[7]  Missouri's asserted transparency interest, which the court accepts, has two layers: (1) an interest in "avoiding the fact or even the appearance of public corruption" and (2) an interest in "knowing who is attempting to influence legislators and public policy."  *Ante* at 11.  The first layer of its argument falls short because, as applied to Calzone, there is no "substantial relation between the disclosure requirement" and the government's anti-corruption interest.  *Swanson*, 692 F.3d at 874–75 (internal quotation marks and citation omitted).  The second layer fares no better because an interest in transparency for transparency's sake is not "sufficiently

---

[6]It is not clear to me that exacting scrutiny applies here.  The only Supreme Court case analyzing a lobbying-disclosure law is *United States v. Harriss*, which applies a test resembling strict scrutiny.  347 U.S. 612, 626 (1954) (upholding a law because it was "designed to safeguard a vital national interest" and "restricted to its appropriate end").  We have adopted a similar approach when presented with challenges to lobbying-related statutes.  *See Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 511 (8th Cir. 1985) (per curiam).  Even if recent campaign-finance decisions cast some doubt on these earlier cases, they have not been expressly overruled, and we have no power to anticipatorily overrule them.  *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  But because I would reach the same conclusion regardless of the level of scrutiny, it is sufficient to note the discrepancy without resolving it.

[7]One could imagine other potential interests that could conceivably justify a less aggressive form of regulation.  For example, if a so-called unpaid lobbyist filled a position of trust as a representative fiduciary of another party, the state could assert an interest in regulating the relationship to prevent exploitation or self-dealing, much like with attorneys.  But Missouri has neither asserted nor tailored its law to serve such an interest here.

important" to justify the burden on Calzone's First Amendment rights. *Id.* (citation omitted).

Missouri begins with its theory that Calzone must register as a lobbyist to prevent the fact or the appearance of corruption. The Supreme Court has recognized that the government has an important, if not compelling, interest in preventing corruption and the appearance of corruption. *See McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality opinion). Beginning with *United States v. Harriss*, courts have generally upheld lobbying-disclosure rules based on the need for the public to know about potentially corrupting financial arrangements. *See* 347 U.S. 612, 625 (1954) (describing Congress's goal as "want[ing] only to know who is being hired, who is putting up the money, and how much"); *Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005) (recognizing the government's compelling interest in "avoiding even the appearance of corruption"). Missouri must still prove, however, that its disclosure requirement, as applied to Calzone, bears a "substantial relation" to its anti-corruption interest. It does not come close to meeting its burden.

Missouri has not pointed to "any plausible reason" why extending its reporting requirements to Calzone—who neither spends nor receives any money—is "necessary to accomplish [its] interest[]." *Swanson*, 692 F.3d at 877. Nor has it "provide[d] any real-world examples" of pure advocacy efforts, divorced from the expenditure of money, leading to the type of corruption (or even the appearance of corruption) that it apparently fears. *McCutcheon*, 572 U.S. at 217–18 (plurality opinion). If Missouri is concerned about the corrupting influence that money could play in connection with Calzone's advocacy, it can address this concern "through less problematic measures," *Swanson*, 692 F.3d at 876–77 (brackets and citation omitted), by, for example, applying the unchallenged portions of its lobbying-disclosure law, *see* Mo. Rev. Stat. § 105.470(5)(a), (b), (d) (extending the registration requirement to individuals who

are paid to lobby *and* to individuals who spend "fifty dollars or more" in a calendar year to influence legislation).

The court bakes up an alternate theory by speculating that "[t]hough the lobbyists may not be receiving money, unpaid lobbyists *could* still offer things of value to legislators, creating a sufficiently important governmental interest in avoiding the fact or appearance of public corruption." *Ante* at 11 (emphasis added). But Missouri already requires people who offer something of value to register. *See* Mo. Rev. Stat. § 105.470(5)(d). So extending the registration requirement to people like Calzone, who have not given anything to anyone, is unnecessary. "[M]ere conjecture" cannot justify burdening First Amendment rights, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000), and neither the court nor Missouri offers us anything more.

All that remains, then, is Missouri's "important interest," as the court puts it, "in knowing who is pressuring and attempting to influence legislators . . . ." *Ante* at 11. But "pressuring and attempting to influence legislators," *id.*, is just another way of describing core political speech, *see Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) ("[I]nteractive communication concerning political change . . . is appropriately described as 'core political speech.'"); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("Discussion of public issues . . . [is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression . . . ." (citation omitted)); *United States v. Fin. Comm. to Re-elect the President*, 507 F.2d 1194, 1201 (D.C. Cir. 1974) ("Lobbying is of course a pejorative term, but another name for it is petitioning for the redress of grievances."). The court, like Missouri, fails to explain why compiling a public list of people who are engaging in core political speech is "important."

Indeed, the court's decision in this case is in tension with *McIntyre*, which recognized that the "decision to remain anonymous," like the decision to speak itself, "is an aspect of the freedom of speech protected by the First Amendment." 514 U.S. at 342. To be sure, *McIntyre* involved anonymous handbills published in an attempt to influence a referendum. But there, like here, the state attempted to justify its law, and in particular the penalty it imposed on violators, based on an "interest" in having the "electorate" receive what the state deemed to be "relevant information." *Id.* at 348.

The Supreme Court rejected Ohio's asserted transparency-related interest, holding that "providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *Id.* at 348–49. So too here. Calzone engages in core political speech just like the anonymous speaker in *McIntyre*, wants to retain control over his communications, and objects to being forced to disclose the "content of [his] thoughts on . . . controversial issue[s]" to the world. *Id.* at 355; *see also* Mo. Rev. Stat. § 105.473(12) (requiring lobbyists to report all of the legislation they supported or opposed).

Even so, the court assures us that the burdens on Calzone are "minimal" or "very slight." *Ante* at 12. The court's assurances, however, offer little comfort in light of the "minimal" justifications and evidence that Missouri provides for regulating the activities of individuals like Calzone. Moreover, the court's characterization understates the burden of complying with Missouri's lobbying-disclosure law.

Under the law, Calzone has to submit up to fourteen reports and to re-register with the Commission each year. *See* Mo. Rev. Stat. § 105.473. The court says, however, that these reports would be "eas[y]" for Calzone to produce because he has no "expenditures related to his lobbying activities." *Ante* at 13. But this argument proves my point. Missouri cannot possibly have a greater interest in receiving blank

reports than Calzone has in avoiding unnecessary paperwork, especially because meeting Missouri's technical filing rules is a legal requirement for exercising his First Amendment rights and the penalties for noncompliance are steep.  Mo. Rev. Stat. §§ 105.478, 558.011(1)(5) (authorizing a punishment of up to four years in prison); *see also id.* § 105.473(7) (setting a fine of up to $10,000 for employing an unregistered lobbyist).   The only thing "minimal" about Missouri's lobbying-disclosure law is the registration fee of $10, but even that is too high when all Calzone wants to do is speak.

The completed puzzle here is more troubling than the sum of its parts. Although Calzone presents an as-applied challenge, which prevents us from considering other potential challengers to Missouri's law, the scope of the law is far-reaching.  It does not appear to treat a member of a religious or civic organization who has been "designated" to attend a "Lobby Day" any differently from Calzone, who advocates on behalf of Missouri First.  The law seemingly sweeps up all unpaid political advocacy by anyone who acts on behalf of someone else, no matter how often it occurs and regardless of its purpose.

By sweeping so widely, Missouri's law endangers the free exchange of ideas. Indeed, a political adversary, an unscrupulous government official, or even a legislator tired of being held accountable could simply submit a complaint to the Commission accusing a politically active citizen of lobbying—that is, speaking out—without first registering as a lobbyist.  It may just be simpler for a citizen to skip a lobbying day or pass up the opportunity to call a legislator rather than having to complete tedious paperwork or risk sizeable fines and criminal penalties.

## III.

Missouri's lobbying-disclosure law, as applied to Calzone, does not withstand exacting scrutiny.  I would accordingly remand this case to the district court for consideration of what relief, if any, Calzone is due.

_____