# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-2654
_____

Ronald John Calzone

*Plaintiff - Appellant*

v.

Donald Summers, in his official capacity as Chairman of the Missouri Ethics Commission; Kim Benjamin, in her official capacity as Vice-Chairwoman of the Missouri Ethics Commission; George Ratermann, in his official capacity as Commissioner of the Missouri Ethics Commission; Wayne Henke, in his official capacity as Commissioner of the Missouri Ethics Commission; Sherman Birkes, in his official capacity as Commissioner of the Missouri Ethics Commission; Cheryl Walker, in her official capacity as Commissioner of the Missouri Ethics Commission; Elizabeth Ziegler, in her official capacity as Executive Director of the Missouri Ethics Commission

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 19, 2019
Filed: November 1, 2019

_____

Before SMITH, Chief Judge, LOKEN, COLLOTON, GRUENDER, BENTON, SHEPHERD, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, En Banc.

_____

STRAS, Circuit Judge, with whom SMITH, Chief Judge, GRUENDER, ERICKSON, GRASZ, and KOBES, Circuit Judges, join.

Ronald Calzone frequently talks to Missouri legislators about political issues that are important to him. The State says that, because he runs a nonprofit corporation, he may do so only if he goes through the effort and expense of registering as a "legislative lobbyist," even though no one pays him and his activities do not involve spending money. We hold that this burden, as applied to Calzone, violates the First Amendment.

I.

Calzone is an active figure in Missouri politics. He "regularly speaks to legislators," sometimes in one-on-one meetings and other times by testifying before Missouri's General Assembly. Importantly, however, Calzone only talks and listens when pressing his views with legislators. He does not get paid in connection with his activities, nor does he "make expenditures for the benefit of" public officials.

Calzone often acts through a nonprofit corporation called Missouri First, Inc. The parties agree that this organization is effectively his alter ego: he is its incorporator, sole officer, president, director, and registered agent. According to Missouri First's charter, it seeks to "educat[e] and mobiliz[e] the public" about matters of civic importance and support various candidates and initiatives. Like Calzone himself, Missouri First spends and receives no money in pursuit of these goals.

According to Missouri, Calzone's ties to Missouri First make him a "legislative lobbyist." Mo. Rev. Stat. § 105.470(5). As relevant here, this label applies to "any natural person who acts for the purpose of attempting to influence" legislative activities and has been "designated to act as a lobbyist by any . . . nonprofit corporation, association[,] or other entity." *Id.* § 105.470(5)(c). All lobbyists must navigate a maze of legal requirements.

-2-

They must first file a registration form, under penalty of perjury, with the Missouri Ethics Commission within five days of beginning any lobbying activities. *Id.* § 105.473.1. The form, which costs ten dollars to file, requires disclosure of the lobbyist's name and business address, as well as the names and addresses of anyone "employ[ed] for lobbying purposes." *Id.* This information becomes a matter of public record. *Id.*

There are also ongoing obligations. Lobbyists must update the Missouri Ethics Commission within one week of a "change in [their] employment or representation." *Id.* They are required to file monthly declarations, again under penalty of perjury, listing any expenditures they make. *Id.* § 105.473.3. And twice a year, they have to disclose what "proposed legislation [they] . . . supported or opposed." *Id.* § 105.473.12. All of these reports are public too. *Id.* §§ 105.473.6, 105.477.4, .5.

Noncompliance carries severe penalties. In addition to hefty fines, violators face prison time—up to four years for repeat offenders. *See id.* §§ 105.473, 105.478, 558.002.1, 558.011.1(5), (7). Anyone can initiate an investigation simply by filing a complaint with the Missouri Ethics Commission. *See id.* §§ 105.472, 105.966. Calzone has faced two official complaints, including one that resulted in a formal inquiry.

Convinced that these restrictions violate his First Amendment free speech and petition rights, Calzone sought a permanent injunction to prevent members of the Missouri Ethics Commission from "enforcing [the law] against [him]."[1] In support of his request for individual injunctive relief, Calzone's focus has been on why the

---

[1]To be sure, Calzone initially asked for a temporary restraining order and preliminary injunction covering all similarly situated individuals. But this request just reflected the fact that Calzone's backup theory was that the law is facially unconstitutional because it is too vague. As the district court recognized, Calzone's primary theory has always been that "any application of [the law] *to him* is a violation of his First Amendment rights." (Emphasis added).

restrictions are unconstitutional in light of his particular method of advocacy. He has stressed, for example, that he "does not accept money for his activism, nor does he spend money on legislators and legislative staff when he communicates with them about his public policy beliefs." Suggestions in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctive Relief at 11.

Calzone's lawsuit has so far been unsuccessful. The district court denied a permanent injunction and entered final judgment against Calzone. Working from stipulated facts, the court ruled that his as-applied challenge failed because enforcement of the law against him had a "substantial relation" to "sufficiently important" state interests. It also rejected Calzone's argument that the law is unconstitutionally vague.

## II.

Both of Calzone's constitutional claims present purely legal questions that we review de novo. *See Llapa-Sinchi v. Mukasey*, 520 F.3d 897, 899 (8th Cir. 2008). The ultimate decision of whether to grant or deny a permanent injunction, however, lies within the district court's discretion. *See Kittle-Aikeley v. Strong*, 844 F.3d 727, 735 (8th Cir. 2016) (en banc).

## A.

We begin with Calzone's claim that Missouri's lobbying requirements violate his freedom of speech and right to petition the government. *See* U.S. Const. amend. I. This challenge, unlike his void-for-vagueness claim, is as-applied, meaning that we must examine the constitutionality of the law in light of "the particular facts of [Calzone's] case." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (citation omitted). And that means *every* fact, including that Calzone "does not make expenditures for the benefit of . . . public officials . . . in connection

-4-

with" his advocacy.[2] Order at 6, June 26, 2017 (reciting the jointly stipulated facts); *see also* Verified Compl. at 1 ¶ 2 ("[H]e does not give legislators any gifts."); *id.* at 11 ¶¶ 56–60 (incorporating his allegations to support his request for an injunction). *Cf. Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 676 (2010) (recognizing that litigants are "entitled to have their case tried upon" stipulated facts (brackets and citation omitted)); *Gander v. Livoti*, 250 F.3d 606, 609 (8th Cir. 2001) ("Valid stipulations are controlling and conclusive, and courts must enforce them.").

The dissenters suggest that there is something different about this case, primarily because Calzone has consistently *emphasized* his lack of pay over his lack of expenditures. But the test for forfeiture is not how many times a litigant has raised a particular issue or fact, but rather whether it has been raised in a timely manner. *See United States v. Olano*, 507 U.S. 725, 731 (1993) (describing forfeiture as "the failure to make *timely* assertion of the right" (emphasis added and citation omitted)); *Universal Title Ins. v. United States*, 942 F.2d 1311, 1314 (8th Cir. 1991) (acknowledging our discretion to consider a "nuance or shift in approach" that a party did not "similarly urge[]" before the district court (citation omitted)). And here it has been. Calzone has raised the no-expenditures point at numerous steps in the litigation—starting with his appearance before the Missouri Ethics Commission; continuing with his complaint, his memorandum in support of a permanent

---

[2]The principal dissent agrees, at least in theory, and includes a lengthy discussion of facts that have little bearing on the question it eventually answers: whether Missouri may require an uncompensated individual to register and report as a legislative lobbyist. It goes into detail about, among other things, the content of Missouri First's charter, various statements it makes on its website, and even what Calzone says when he approaches legislators. Yet the dissent refuses to even consider Calzone's lack of expenditures—a fact that was established by a written stipulation between the parties. Joint Stipulation at 1. The dissent cannot have it both ways.

injunction, and the joint stipulation of facts;[3] and ending with his briefs to this court.[4] Only the dissenters disagree.

---

[3]*See, e.g.*, Transcript of Oral Argument at 12, *Calzone v. Mo. Ethics Comm'n*, No. 15-1450 EC (Mo. Admin. Hr'g Comm'n Feb. 3, 2016) ("[Calzone does not] dispute that someone who gives a gift to a legislator may be regulated as a lobbyist. That's simply not the case here."); Suggestions in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctive Relief at 1 ("[Calzone] does not provide gifts, meals, or anything of value to legislators or legislative staff in connection with his activism."); *id.* at 9 (arguing that the Missouri law is unconstitutional because it requires registration even for those who do not "receiv[e] any compensation and [who do not] expend[] any money"); *id.* at 11 (noting that Missouri's interest in identifying who is "putting up the money, and how much," is not served by forcing Calzone to register because he does not "spend money on legislators and legislative staff" (citation omitted)); Joint Stipulation at 1 ("Plaintiff does not make expenditures for the benefit of one or more public officials or one or more employees of the legislative branch of state government in connection with [speaking with legislators].").

[4]Plaintiff-Appellant's Opening Brief at 2 (making clear that Calzone "does not make expenditures . . . in connection with" his advocacy activity (internal quotation marks omitted)); *id.* at 2–3 (same); *id.* at 11–12 (arguing that Missouri, in applying its law to him, has taken "the extraordinary position . . . that the receiving or spending of money is completely irrelevant to a person's status as a lobbyist"); *id.* at 19 (noting that Missouri requires registration of advocacy efforts divorced from any "monetary dimension whatsoever"); *id.* at 20 n.10, 21, 23–26, 25 n.13 (emphasizing that lobbyist-disclosure laws have been upheld in the past, but only as applied to individuals who have been hired to influence legislators or who spend money on their lobbying); *id.* at 26 (claiming that the district court erred "[b]y permitting the government to regulate Mr. Calzone—who was not hired, has not put up money, and has spent nothing to petition his government"); Plaintiff-Appellant's Reply Brief at 2 (noting that "there is not even a suggestion that Calzone gives gifts to legislators"); *id.* at 4–5 (arguing that the state's interest in combating corruption is not served by regulating an unpaid volunteer who does not "expend[] money . . . in connection with his political activism"); *id.* at 6 ("[T]his Court is not at liberty to extend the reasoning applied in *Harriss* to allow regulation of citizen activists whose political statements are completely unrelated to monetary expenditures."); *id.* at 10 (arguing that campaign-finance-disclosure cases are distinguishable, "especially on these facts," because here there is no "financial dimension"); *id.* at 12–14 (claiming

Even Missouri seemingly reached the same conclusion long ago, having never raised a forfeiture objection despite numerous opportunities to do so. As counsel for Missouri put it at oral argument before the original three-judge panel, Calzone has

> *two* reasons why he thinks he's special compared to other lobbyists. One is he's not buying lunch and giving money to [the] legislators. Two, his organization that has him in the post of president isn't paying him to be their president, et cetera. *I understood his brief to say that both of these points were salient to his claim.*

Oral Arg. at 18:00–19:45 (emphasis added). Missouri had a clear opportunity to raise forfeiture after it became apparent that a threshold disagreement between the members of the original panel was whether Calzone had preserved his no-expenditures point. *See Calzone v. Summers*, 909 F.3d 940, 946–47 (8th Cir. 2018), *reh'g en banc granted, opinion vacated* (Jan. 28, 2019); *id.* at 951–53 & n.5 (Stras, J., dissenting). Rather than doing so, however, Missouri continued to focus exclusively on the *merits* of Calzone's First Amendment challenge, both in its response to his petition for rehearing en banc and in the face of questioning from the en banc court. *See* Resp. Br. Appellees Pet. Reh'g or Reh'g En Banc at 2, 6–8, 11, 14; Oral Arg. at 31:38–32:11; *see also* Pl.–Appellant's Pet. Reh'g and Reh'g En Banc at 2–10 (leading with the argument that the panel majority had ignored aspects of his as-applied challenge). Regardless of whether we characterize Calzone's lack of spending as a fact, an issue, or an argument, if it is possible to forfeit or waive forfeiture, Missouri has done so here. *See, e.g.*, *Robertson v. U.S. Bank, N.A.*, 831

---

that this case is distinguishable from constitutional applications of lobbyist-disclosure laws because here "there is no suggestion that a citizen is receiving or expending money to promote political ideas" and hence no concerns over corruption); *id.* at 15–16 (distinguishing an unpublished opinion from California because Calzone does not spend any money); *id.* at 17–18 (noting that a state's interest in combating corruption "must involve money," but Calzone is uncompensated and spends no money); *id.* at 19 (asserting that if an activist has not given "anything of value" to legislators, there can be "no suggestion of *quid pro quo*" corruption).

F.3d 757, 764 (6th Cir. 2016) ("The Robertsons thus forfeited this forfeiture argument."); *United States v. Jones*, 152 F.3d 680, 684 n.2 (7th Cir. 1998) ("Because the Government has forfeited its forfeiture argument, we shall review Jones's claims according to the standards of review that would have applied if Jones had raised these arguments in the district court."); *Tibble v. Edison Int'l*, 843 F.3d 1187, 1193 (9th Cir. 2016) (en banc) ("Edison itself forfeited the forfeiture argument . . . ."); *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1139 (10th Cir. 2010) ("Plaintiffs have themselves forfeited any forfeiture argument . . . ."); *Petaluma FX Partners, LLC v. Comm'r*, 792 F.3d 72, 78 (D.C. Cir. 2015) ("[A] forfeiture argument can itself be forfeited.").

After reviewing the record and taking into account the as-applied nature of Calzone's challenge, we conclude that the undisputed fact that Calzone spends no money nor gives anything of value to anyone when pursuing his advocacy activities is a detail that we must consider in evaluating his First Amendment challenge.[5] *Cf. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329–33 (2010) (considering

_____

[5]The selected excerpts from the record, relied upon by the dissenters, are not as helpful to their arguments as they first appear. After all, simply changing the emphasis underscores how closely tied together the facts of Calzone's as-applied challenge really are. *See* Suggestions in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctive Relief at 1 ("This case presents a simple question: Does the First Amendment allow the state of Missouri to punish a citizen *simply for sharing political ideas with members of the state legislature*, even though no one is paying him to do so?" (emphasis added)); Verified Compl. at 3 ¶ 7 (discussing the chilling of citizen engagement for those who "*merely seek to influence legislation* in their private, uncompensated, capacities as active citizens" (emphasis added)); *id.* at 11 ¶ 58 (describing "Mr. Calzone's uncompensated *policy conversations*" (emphasis added)); Motion for Temporary Restraining Order and Preliminary Injunction at 1 (seeking an injunction for "any individual that *speaks about questions of public policy or pending legislation* with members of the General Assembly or legislative staff without being compensated for that activity" (emphasis added)). These excerpts reinforce the idea that Calzone's activities involve no compensation *and* no expenditures—only speech.

a remedy *disclaimed* below and discussing the discretion an appellate court has to hear new arguments supporting a preserved First Amendment claim).

Now that we have concluded that Calzone's entire as-applied challenge is before us, the question is straightforward: can Missouri require Calzone to pay a fee and publicly disclose his political activities, even though he neither spends nor receives any money in connection with his advocacy? We conclude that the answer is no.

Everyone agrees on one point: Calzone is engaged in First Amendment activity. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990) (noting the First Amendment right "to lobby . . . officials to enact favorable legislation"). After all, "interactive communication concerning political change" is at the "core" of the First Amendment, *Meyer v. Grant*, 486 U.S. 414, 422 (1988), and the right "to petition for a redress of grievances [is] among the most precious of . . . liberties," *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).

Missouri calls this activity "lobbying." Regardless of the label, Calzone does not lose his First Amendment rights just because he speaks through an organization that shares his perspective. *See, e.g.*, *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 426; *United Mine Workers*, 389 U.S. at 221–22. To the contrary, both he and Missouri First still have the right to make their views known.

But Missouri also has some power to regulate speech, and the nature of the regulation determines how closely we scrutinize it. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874–75 (8th Cir. 2012) (en banc). Here, Missouri's lobbying law requires Calzone to reveal his identity and divulge his activities. It is, in other words, a "disclosure law," so we review it under a legal framework known as "exacting scrutiny." *See id.* Missouri's burden is to show, at a minimum, that the law has a "substantial relation[ship]" to a "sufficiently

important governmental interest."[6]  *Id.* at 875 (internal quotation marks and citation omitted).  In determining whether the interest is "sufficiently important," our task is to determine whether "the strength of the [asserted] governmental interest . . . reflect[s] the seriousness of the actual burden on [Calzone's] First Amendment rights."  *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (citation omitted).

The burdens of the law are straightforward.  Most obvious is the time and effort required to fill out paperwork.  *Cf. Swanson*, 692 F.3d at 873–74 (stressing "the time and expense of entering a long-term morass of regulatory red tape").  There is also the filing fee itself, of course.  In exchange, Calzone loses his freedom "to remain anonymous" and exposes himself to "retaliation" for his advocacy.  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342, 357 (1995); *cf. NAACP v. Alabama,* 357 U.S. 449, 460–62 (1958) (stressing the chilling effects of "compelled disclosure of affiliation with groups engaged in advocacy").  In short, compliance is not free.  But neither is noncompliance, which exposes violators to fines and possible jail time.

Missouri's asserted justification is "transparency," even though what it means by that is less than clear.  Transparency seems to encompass two ideas.  The first is an interest in sharing information about advocacy activities in order to prevent actual or apparent public corruption.  The second is a general interest in having the world

---

[6]Calzone urges us to apply an even more rigorous standard—strict scrutiny—which would require Missouri "to prove that the [law] furthers a compelling interest and [that it] is narrowly tailored to achieve that interest."  *Swanson*, 692 F.3d at 874 (internal quotation marks and citation omitted).  To be sure, there is some authority for using strict scrutiny in this context.  *See, e.g.*, *United States v. Harriss*, 347 U.S. 612, 626 (1954) (analyzing a lobbying-disclosure law under a test resembling strict scrutiny); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 511 (8th Cir. 1985) (per curiam) (asking whether a law requiring lobbyists to register and file disclosures served a "compelling" interest).  But we need not decide which standard governs here because, even under exacting scrutiny, Missouri may not apply the law to Calzone.  *Cf. Janus v. Am. Fed'n of State, Cty., & Mun. Emps. Council 31*, 138 S. Ct. 2448, 2465 (2018) ("[W]e again find it unnecessary to decide the issue of strict scrutiny because the [challenged] scheme cannot survive under even [exacting scrutiny].").

know who is trying to influence the work of the General Assembly. On this record, neither of these justifications survives exacting scrutiny.

The first interest is no doubt "important," at least in the abstract. *See Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005) (noting a compelling interest in "avoiding even the appearance of corruption"). Indeed, the Supreme Court has long credited anti-corruption rationales in upholding campaign-finance restrictions and disclosure requirements, despite the limitations these kinds of laws place on speech. *See, e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 199, 206–07 (2014) (plurality opinion); *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496–97 (1985); *Buckley v. Valeo*, 424 U.S. 1, 26–27 (1976) (per curiam); *cf. United States v. Harriss*, 347 U.S. 612, 625–26 (1954).

What Missouri has failed to establish, however, is that applying the law to Calzone, who neither spends nor receives money in connection with his advocacy, bears a substantial relationship to its anti-corruption interest. *See Swanson*, 692 F.3d at 875. The government "may target only a specific type of corruption—'*quid pro quo*' corruption"—and Calzone's political activities do not raise the specter of "corruption or its appearance." *McCutcheon*, 572 U.S. at 206–07 (plurality opinion) (collecting cases); *see also id.* at 192. There clearly is no "quid" because Calzone does not spend or receive money, nor offer anything of value to legislators. *See id.* at 207 (recognizing that the appearance of corruption can arise from "large individual financial contributions to particular candidates" (internal quotation marks and citation omitted)); *see also id.* at 225. So whatever "quo" he receives must be due to his speech, not corruption.

To be sure, casting a wide net might make it easier for Missouri to catch legislative lobbyists involved in actual corruption. But so would better-tailored and "less problematic measures," *Swanson*, 692 F.3d at 877 (citation omitted), including another provision that *already* covers those who make "total [annual] expenditures of fifty dollars or more . . . for the benefit of one or more public officials," Mo. Rev. Stat. § 105.470(5)(d); *cf. id.* § 105.452 (prohibiting the acceptance of bribes). *See*

*McCutcheon*, 572 U.S. at 221 (plurality opinion) (noting "multiple alternatives available to Congress that would serve the [same] interest"); *McIntyre*, 514 U.S. at 349 (identifying alternative anti-fraud statutes).  Missouri has failed to show how this provision and other measures fall short in identifying actual or apparent corruption.  *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) (explaining that "mere conjecture" is never "adequate to carry a First Amendment burden"); *cf. McCutcheon*, 572 U.S. at 221 (plurality opinion) (stressing that a "prophylaxis-upon-prophylaxis approach requires that [courts] be particularly diligent in scrutinizing the law's fit" (internal quotation marks and citation omitted)).  Therefore, whatever "ancillary [enforcement] benefits" Missouri receives from requiring uncompensated lobbyists who make no expenditures to register and disclose their activities, "we are not persuaded that they justify" the burden on Calzone's First Amendment rights.  *McIntyre*, 514 U.S. at 351.

Missouri's other transparency interest is broader.  Missouri claims that legislators need to know who is speaking to determine how much weight to give the speech.  Missouri also insists that the public has a right to know who is speaking so that it can hold legislators accountable for their votes and other actions.

These concerns, however, are not "sufficiently important" to justify the burdens placed on Calzone's speech.  *See Swanson*, 692 F.3d at 876.  As the Supreme Court has recognized, speakers ordinarily have the right to keep their identities private.  *McIntyre*, 514 U.S. at 341–43, 348–49, 353–57.  In fact, the right to remain nameless is "an aspect of the freedom of speech protected by the First Amendment" and a component of "a respected tradition of anonymity in the advocacy of political causes."  *Id.* at 342–43.  This principle applies with particular force here because "core political speech" is at issue.  *Id.* at 346–47; *see also Superior Court Trial Lawyers Ass'n*, 493 U.S. at 426.  So Missouri's "simple interest in providing voters with additional relevant information does not justify a state requirement that [Calzone] make statements or disclosures [he] would otherwise omit."  *McIntyre*, 514 U.S. at 348.  Nor does legislative curiosity justify upfront disclosure of information that legislators can presumably find out on their own.

We do not doubt that when money changes hands, the nature of Missouri's transparency interest changes too, because the risk of quid pro quo corruption increases. *See Buckley*, 424 U.S. at 66–67; *see also McIntyre*, 514 U.S. at 354–56 (suggesting that this interest boils down to preventing corruption or its appearance); *cf. Harriss*, 347 U.S. at 625 (explaining that the legislature has a legitimate interest in knowing "who is being hired, who is putting up the money, and how much"). Nor do we question that there are other interests that can justify compelled-disclosure laws. *See, e.g.*, *John Doe*, 561 U.S. at 191–92, 195–99 (addressing a petition that had the direct legal effect of putting a referendum on a statewide ballot); *McIntyre*, 514 U.S. at 352–53 (discussing the dissemination of false political literature). But Missouri does not rely on these interests, or any interests like them. Calzone neither spends nor receives money in connection with his activities, nothing he says carries any legislative force, and there is no suggestion that he is deceiving anyone. Rather, he wants to "make [his] wishes known to [his] representatives." *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961); *see also McDonald v. Smith*, 472 U.S. 479, 482 (1985) ("The right to petition . . . is implicit in the very idea of government, republican in form." (brackets, internal quotation marks, and citation omitted)).

\* \* \*

Given that Calzone's political activities do not involve the transfer of money or anything of value, either to him or to anyone else, Missouri's interest in transparency does not "reflect the seriousness of the actual burden on [his] First Amendment rights." *Swanson*, 692 F.3d at 876 (citation omitted). Accordingly, the application of the law to Calzone violates the First Amendment.

B.

Calzone's other claim is that the law is facially invalid because ordinary citizens do not have fair notice of whom it covers. *See Hill v. Colorado*, 530 U.S. 703, 732–33 (2000). He focuses on the fact that Missouri defines "legislative

-13-

lobbyist" to include anyone who is "*designated* to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association[,] or other entity." Mo. Rev. Stat. § 105.470(5)(c) (emphasis added). According to Calzone, the word "designated" is vague.

Even though the law does not define or otherwise explain what "designated" means, it is not vague. Rather, in the absence of a statutory definition, we apply a word's common and ordinary meaning, taking into account the context in which it is used. *See DRB No. 24, LLC v. City of Minneapolis*, 774 F.3d 1185, 1188 (8th Cir. 2014). In this context, to "designate" means to "name [someone] to a post or function," *Webster's Third New International Dictionary* 612 (2002), or to "select [someone] for a duty, office, or purpose," *The American Heritage Dictionary of the English Language* 491 (5th ed. 2011). So when a group selects someone to speak to a legislator or otherwise influence legislative action, the person selected becomes a "legislative lobbyist." Although individual cases may present difficult questions, the statute is clear enough that a person "of ordinary intelligence" can "reasonabl[y] . . . understand [it]."[7] *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1143 (8th Cir. 2005) (citation omitted); *see also Harriss*, 347 U.S. at 618 ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise.").

Of course, the law's designation clause has the effect of broadly defining who is a lobbyist. Under the plain terms of the statute, for example, if a gardening club decides to have one of its members write the General Assembly and ask that Missouri select a new state flower, then the letter writer has been "designated . . . by an[] . . . association" to "act[] for the purpose of attempting to influence . . . official [legislative] action." Mo. Rev. Stat. § 105.470(5). But just because the law is broad does not mean that it is ambiguous, much less unconstitutionally vague.

---

[7]To the extent Calzone argues that *he* should not have to comply with the law because Missouri First has never officially "designated" him as its representative, this theory falls outside the scope of the facial challenge he has chosen to pursue.

-14-

## III.

We accordingly vacate the judgment and remand for further consideration of Calzone's request for a permanent injunction.

GRASZ, Circuit Judge, concurring.

I join the court's opinion in full. I write separately to address the question it left open: whether laws mandating disclosure of information as the price of petitioning one's government are subject to exacting scrutiny or strict scrutiny under the First Amendment. I believe the correct standard is strict scrutiny. The district court's contrary conclusion disregarded circuit precedent[8] and rested on an overly broad reading of the Supreme Court's opinion in *Citizens United v. FEC*, 558 U.S. 310 (2010).

---

[8]This court's precedent applying strict scrutiny when reviewing lobbying disclosure statutes under the First Amendment is clear. *See Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 511 (8th Cir. 1985). In the absence of a controlling Supreme Court decision to the contrary, the district court as well as any panel of this court, was bound to apply this circuit's precedent. *See Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) ("The District Court, however, is bound, as are we, to apply the precedent of this Circuit."). Notably, the vacated panel decision cited to *Swanson* to support its legal conclusion that "exacting" rather than "strict" was the applicable level of scrutiny. *Calzone v. Summers*, 909 F.3d 940, 945 (8th Cir. 2018), *reh'g en banc granted, opinion vacated*, January 29, 2019. However, the en banc court in *Swanson* did not overrule our precedent governing review of lobbying disclosure statutes. In fact, the court in *Swanson* did not even purport to decide which level of scrutiny applied. Rather, the en banc court stated, "*even if* exacting scrutiny is appropriate . . . Minnesota's law fails." *Swanson*, 692 F.3d at 875 (emphasis added). Consequently, *Swanson* provided no basis to view *Kelley* and *National Rifle* as anything other than binding precedent as to the level of scrutiny for reviewing lobbying disclosure laws. The application of the wrong standard in evaluating laws burdening core First Amendment freedoms was, in my view, a compelling and independent reason to hear this case en banc.

It is a basic proposition that "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (cleaned up). The Supreme Court's lone opinion addressing the constitutionality of lobbying disclosure laws, written before the full development of the modern tiers of scrutiny, applied something akin to strict scrutiny. *See United States v. Harriss*, 347 U.S. 612, 626 (1954) (upholding the challenged law because it served a "vital national interest"). And this court has repeatedly applied strict scrutiny when reviewing lobbying disclosure statutes. *See Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 511 (8th Cir. 1985).

I do not believe that *Citizens United* undermined this circuit's precedent of applying strict scrutiny to lobbying disclosure laws. In *Citizens United*, the Supreme Court applied exacting scrutiny in addressing a challenge to a law mandating disclosure and reporting requirements for *electioneering expenditures*, not *lobbying*. Context matters. To read *Citizens United* as demanding the exacting scrutiny standard for *any regulation* involving *any sort of disclosure* and burdening *any category of speech*, in my view, misses the mark. *See* Bryan A. Garner, et al., *The Law of Judicial Precedent*, 88–91 (2016) (discussing how to interpret the scope of a rule in an opinion); *see also Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874–75 (8th Cir. 2012) (en banc) (questioning whether states could avoid strict scrutiny of regulatory schemes burdensome to political speech by "simply placing a 'disclosure' label" on them because to do so "risks transforming First Amendment jurisprudence into a legislative labeling exercise").

There are sound reasons for not abandoning our application of strict scrutiny to lobbying disclosure laws. Again, the baseline rule is that "[l]aws that burden political speech are 'subject to strict scrutiny,'" *Citizens United*, 558 U.S. at 340, and petitioning one's government is unquestionably core political speech. In the absence of direction from the Supreme Court, there is no reason to extend *Citizens United*'s application of exacting scrutiny to a quite different context. The Court in

*Citizens United* recognized the "governmental interest in providing the electorate with information about the sources of election-related spending," the risk of "independent groups . . . running election-related advertisements while hiding behind dubious and misleading names," and the interest in "helping citizens make informed choices in the political marketplace." 558 U.S. at 367 (cleaned up). The risks and accompanying governmental interests associated with lobbying/petitioning one's government are fundamentally different.

None of this is to say that laws narrowly tailored to prevent quid pro quo corruption and the appearance thereof could never survive strict scrutiny. But where the government burdens the fundamental right of citizens to petition their government, the law must be narrowly tailored to achieve a compelling governmental interest. *Citizens United* does not mandate a lower standard.[9]

COLLOTON, Circuit Judge, with whom LOKEN and BENTON, Circuit Judges, join, dissenting.

The court's decision in this case will be remembered more for its procedural irregularities than for anything it says about the First Amendment. "Too often our colleagues on the district court complain that the appellate cases about which they

[9]To avoid any misperception as to the nature of this standard it is important to note that exacting scrutiny is much more rigorous than rational basis scrutiny and it is certainly not "a rubber stamp." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876 (8th Cir. 2012) (en banc). Nor is it, as Calzone states in his brief, an "overly-deferential approach." As its name suggests, it is *exacting*. *See Swanson*, 692 F.3d at 876 (citing four cases where the Supreme Court held laws unconstitutional under the exacting scrutiny standard). While "possibly less rigorous than strict scrutiny," it requires a "substantial relation" between the challenged law and a "sufficiently important governmental interest." *Id.* at 875–76. And the Supreme Court's recent articulation of the exacting scrutiny standard suggests it is not far from strict scrutiny. *See McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) ("Under exacting scrutiny, the Government may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest.").

read were not the cases argued before them." *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998). This case will be Exhibit A. So too, en banc rehearing in a court of appeals customarily should be reserved for questions of exceptional importance that have been considered first by a district court and a three-judge panel. Yet the en banc majority functions here as a court of first view and reverses a judgment based on an issue that was never addressed at earlier stages of the litigation. I would vacate the order granting rehearing as improvidently entered.

Judge Shepherd's dissenting opinion convincingly demonstrates the shift in Calzone's argument on appeal. Section 105.470(5)(c) of the Missouri Revised Statutes, through its definition of "legislative lobbyist," calls for registration and disclosures by one who "[i]s designated to act as a lobbyist." Section 105.470(5)(d) encompasses one who "[m]akes total expenditures of fifty dollars or more . . . for the benefit of one or more public officials." The Missouri Ethics Commission asserted that Calzone is covered by subsection (c). In response, Calzone argued that the First Amendment forbids the State to require registration and disclosures by an *unpaid* lobbyist.

It was perfectly logical for the district court to understand Calzone's argument to mean what it said. His theory, if correct, would have been sufficient to exempt him from *both* subsection (c) and subsection (d). He would have won this case. And he may well have perceived a tactical advantage in attempting to prevail solely on the basis that he was uncompensated. Of course, Calzone *could have* raised instead a narrower challenge to subsection (c) that the State must exempt only uncompensated lobbyists who make no expenditures. But whether he did so is a question of law, not logic. Every case involves an array of facts, and it is up to the plaintiff in framing the issue to assert which facts have legal significance.

The court's assertion, *ante*, at 3–4, that the "focus" of Calzone's legal argument in the district court involved his lack of expenditures misstates the record. A party with a focus on lack of expenditures does not open his brief in support of injunctive relief as follows: "This case presents a simple question: Does the First Amendment allow the state of Missouri to punish a citizen simply for sharing

-18-

political ideas with members of the state legislature, *even though no one is paying him to do so*?" R. Doc. 2-1, at 1 (emphasis added). Nor does he place a heading on his written argument to the district court that focuses solely on lack of compensation: "**II. The Missouri Legislative Lobbyist Statute Violates the First Amendment *As-Applied to Uncompensated Individuals*, And It Is Facially Void For Vagueness.**" *Id*. at 9 (italics added). A party with a focus on lack of expenditures does not stand face to face with the district judge at the hearing on his motion for permanent injunction and state at the outset: "[T]his is a pure question of law, and it is a pure question of law on the question *whether or not an individual who is uncompensated* may be required to register and report as a legislative lobbyist with the Missouri Ethics Commission." R. Doc. 41, at 4 (emphasis added).

What really happened is that Calzone, after pressing his uncompensated-lobbyist argument before the district court and in his opening brief on appeal, changed his legal theory at oral argument in the court of appeals. The three-judge panel rejected this gambit and addressed only the issue that was stated in Calzone's appellate brief: "May the government, consistent with the First and Fourteenth Amendments to the United States Constitution, *require unpaid individuals* to comply with Missouri's registration and reporting regime for legislative lobbyists?" Appellant's Br. 1 (emphasis added). And rightly so: "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.). Yet the en banc majority now takes up Calzone's reformulated cause in the first instance.

This is an unwise use of the en banc process. Where there is no disuniformity in this court's decisions, en banc rehearing is disfavored and designed only for proceedings that involve a "question of exceptional importance." Fed. R. App. P. 35(a)(2). Whether the district court and the three-judge panel properly decided only Calzone's uncompensated-lobbyist claim is not a question of exceptional importance. It is an isolated issue that turns on an interpretation of Calzone's

particular briefs and oral arguments.  It is not, for example, an issue "likely to affect many other cases," *Walters v. Moore-McCormack Lines, Inc.*, 312 F.2d 893, 894 (2d Cir. 1963) (statement of Lumbard, C.J.), a question of "real significance to the legal process as well as to the litigants," *Church of Scientology v. Foley*, 640 F.2d 1335, 1341 (D.C. Cir. 1981) (Robinson, J., dissenting), or an issue "with an usually significant impact on the work of the Circuit."  *Bartlett v. Bowen*, 824 F.2d 1240, 1246 (D.C. Cir. 1987) (Silberman, J., concurring in the denials of rehearing en banc). Even if one believes that the district court and the three-judge panel should have ventured beyond Calzone's statement of the issue, the time-consuming and unwieldy en banc process should not be employed "'merely' to correct individual injustices or mistakes" of this nature.  *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1021 (2d Cir. 1973) (Oakes, J., dissenting from denial of rehearing en banc).[10]

Beyond that, the en banc majority proceeds to file a broad, categorical decision on a constitutional question of first impression without the thorough development that ordinarily precedes such an action.  Unlike the typical en banc rehearing, this proceeding does not present a question of exceptional importance that has been properly vetted in the litigation process, where competing views can be aired, and subtleties and nuances explored.  Is it really so clear, for example, that the First Amendment leads to the same conclusion about lobbying disclosures for a member of a gardening club who writes to a legislator, a self-described lobbyist like Calzone who seeks to exploit "strength in numbers" to influence legislators, and a "volunteer" lobbyist for, say, the Sierra Club or the National Rifle Association? Surely an en banc court would benefit from the studied consideration of counsel, a district judge, and a three-judge panel before addressing the merits of a no-expenditures as-applied challenge.

---

[10]Insofar as one concurring judge may have voted to grant rehearing with the thought of addressing the appropriate level of scrutiny for a lobbying disclosure statute, the en banc court expressly declines to decide that legal issue.  *Ante*, at 10 n.6.

Denial of rehearing en banc, of course, would not foreclose a future litigant from challenging the Missouri lobbying statute as applied to a lobbyist who makes no expenditures. The panel decision expressly declined to resolve that question on the ground that it was not properly presented. The issue thus remained open for decision by a district court and a three-judge panel in a future case. Accordingly, I would vacate the order granting rehearing as improvidently entered and reinstate the panel decision. Failing that, I join Judge Shepherd in rejecting Calzone's contention that the State must exempt him from the statutory disclosure requirements because he is uncompensated.

SHEPHERD, Circuit Judge, with whom COLLOTON and KELLY, Circuit Judges, join, dissenting.

Facts are not issues. While this case arises from many historical facts, the single issue before us was selected, framed, and presented by Ronald Calzone long ago: "a pure question of law on the question of whether or not an individual who is uncompensated may be required to register and report as a legislative lobbyist with the Missouri Ethics Commission." R. Doc. 41, at 4. By Ronald Calzone's attorney's own words, this is all Calzone's case has ever been about. Despite the clear nature of his challenge, the majority now answers a wholly different question, improperly expanding his challenge to include lobbyists who make no expenditures in addition to receiving no compensation. The majority compounds this error by ignoring the record evidence of Calzone's extensive lobbying efforts and incorrectly casting Calzone as a modern-day folk hero who wants nothing more than to be free to petition his government. Considering the only issue that Calzone raised and thus the only issue we may consider—whether the law is unconstitutional as applied to him, a lobbyist who receives no compensation—I would conclude that Mo. Rev. Stat. §§ 105.470, 105.473 pass constitutional muster. I respectfully dissent.[11]

_____

[11]I, too, would vacate the order granting rehearing and reinstate the panel decision. In the alternative, I express my views on the merits in this dissenting opinion.

# I.

To understand Calzone's argument, it is first important to understand who Calzone is and what Missouri First does.[12]  The majority describes Calzone and this case as one that involves the average politically active citizen whose interests have found him unwittingly ensnared in complex and laborious disclosure requirements meant for lobbyists, not people like Calzone.  This narrative is not supported by the record.  Calzone is not the average Missouri citizen, interested only in talking and listening about political issues that are important to him.  Although the majority describes Calzone as wanting to do no more than represent himself and those faceless Missourians without a lobbyist, and asserts that his advocacy efforts are considered lobbying only because Missouri says so, Calzone is *precisely* who the law considers a lobbyist.  The majority even acknowledges that Calzone is not the average citizen, noting that he is "an active figure in Missouri politics."

And Missouri First is much more than just Calzone's alter ego; it is clearly a lobbying organization.  Indeed, it would be surprising if Calzone did not consider himself a legislative lobbyist working on behalf of a lobbying firm.  He is the sole incorporator of Missouri First and responsible for filing the organization's charter which states that:

> Missouri First will give priority to educating and mobilizing the public to meet our objectives.  Media advertising, public oratory, informational seminars, *legislative lobbying*, and citizen involvement may be used to teach *or to influence public policy*. . . . Missouri First *will campaign for legislative and ballot issues*, but will not lobby or campaign for a particular political party.

[12]From the commencement of this case until oral argument before the panel, Calzone has identified the issue presented as "whether or not an individual who is uncompensated may be required to register and report as a legislative lobbyist with the Missouri Ethics Commission."  Recognizing that facts are not issues, the evidence as to who Calzone is and the nature of Missouri First and its activities is set forth only in response to the majority's inaccurate and continued characterization of Calzone as merely an average citizen who simply "talks and listens."

R. Doc. 1-2, at 36-37 (emphases added).  The Missouri First website recruits new members by emphasizing that "'there is strength in numbers' . . . especially when *lobbying* Missouri House and senate members."  R. Doc. 34, at 5 (emphasis added).  Calzone regularly meets with individual legislators, legislative staff, and legislative groups to advocate for the passage or blocking of legislation, typically identifying himself as "Ron Calzone, Director of Missouri First, or Ron Calzone, a director of Missouri First." R. Doc. 34, at 5.  On a witness form in the Missouri Senate, "Mr. Calzone identifie[d] himself as appearing on behalf [of] not himself, but appearing on behalf of Missouri First, Inc.[,]" and "[w]hen speaking to legislators, whether in testimony before the General Assembly or in inperson meetings, [he] regularly notes that he is a director of Missouri First, Inc." R. Doc. 34, at 5-6.  By Calzone's own identification of himself to legislators as appearing on behalf of Missouri First, he admits that he is a lobbyist, not an individual citizen who wants only to express his personal views or a general consensus of unrepresented citizens to his legislator.

Given this record evidence, Calzone is clearly a typical lobbyist operating on behalf of a lobbying organization, despite his efforts to tether these definitions solely to whether he receives compensation.  He is not a bystander inadvertently swept up by the broad reach of the disclosure law; he is exactly the kind of person or party the legislation was intended to cover.  With this understanding of Calzone and Missouri First in mind, I turn to the merits of Calzone's challenge.

II.

A.

The majority's crucial misstep, in my view, is its unyielding determination to address an issue Calzone never raised: whether the disclosure law can constitutionally apply to Calzone when he makes no expenditures.  Calzone did not raise the issue of expenditures before the district court nor did he raise it to this Court until oral argument before the original panel.  The pleadings make clear that Calzone, the master of his own complaint, raised only the issue of whether Mo. Rev. Stat.

§§ 105.470, 105.473 could constitutionally apply to him as an unpaid lobbyist. But the majority completely ignores this and glosses over the fact that expenditures have never been a part of Calzone's claim.

Time and time again, before both the district court and this Court, Calzone limited his claim to the contention that an *uncompensated individual* cannot be required to register and report as a lobbyist; nowhere did he include a lack of expenditures as a part of the issue presented. The record is as abundant as it is clear in demonstrating Calzone raised only the issue of whether the law is constitutional as applied to him when he received no compensation.[13]

Before the district court, Calzone stated his case without raising the issue of expenditures:

- Calzone's complaint alleged a cause of action under the First and Fourteenth Amendments, stating "[s]pecifically" that the state of Missouri violated his rights by seeking to apply the lobbying statutes to his "uncompensated policy conversations." R. Doc. 1, at 11.

- Calzone's complaint alleged that the disclosure statute chilled citizen engagement "when they merely seek to influence legislation in their private, uncompensated, capacities as active citizens." R. Doc. 1, at 3.

- Calzone's motion for a preliminary injunction sought an order preventing Missouri from enforcing the lobbying statutes "against any individual that acts without being compensated," "against those who act without being compensated," and "against any individual that speaks about questions of

---

[13]The majority suggests that the record is not so clear, asserting that Calzone mentioned a lack of expenditures throughout the record below. Not so. First, the majority's reference to any part of the proceedings before the Missouri Ethics Commission is irrelevant, as nothing in those proceedings could expand the issue Calzone presented and argued in the district court and on appeal. And again, the majority confuses the handful of factual references to whether the lobbyist Calzone makes expenditures with the issue he chose to present to the district court and which he briefed on appeal.

public policy or pending legislation with members of the General Assembly or legislative staff without being compensated for that activity." R. Doc. 2, at 1-2.

- Calzone's suggestions in support of his motion for a preliminary injunction summarized his entire case as "present[ing] a simple question: Does the First Amendment allow the state of Missouri to punish a citizen simply for sharing political ideas with members of the state legislature, even though no one is paying him to do so?" R. Doc. 2-1, at 1.

- Calzone's suggestions in support also described "the alleged violation of Missouri's legislative lobbyist statute [] as an uncompensated citizen speaking to legislators or legislative staff[,]" and summarized his argument in a heading as follows: "By regulating uncompensated citizen activists as legislative lobbyists, and demanding that those individuals register and report to Defendants, the Missouri legislative lobbyist statute is unconstitutional as-applied to Plaintiff and those similarly situated." R. Doc. 2-1, at 6, 9.

- At the hearing on the preliminary injunction, the district court stated: "As I understand that you are - - your claim says that this interpretation of 'designate' chills First Amendment rights *because he's not receiving compensation*, there's no legitimate government interest in enforcing the lobbying statute against *an uncompensated lobbyist*, and it's a vague statute. Is that correct?" To which Calzone's attorney responded "*That is correct, Your Honor, those are all of our contentions.*" R. Doc. 24, at 10 (emphases added).

- At the hearing on the permanent injunction, Calzone's attorney stated, "As the parties seem to have come to the conclusion, given that we have stipulated on facts that are necessary for the resolution of this proceeding, this is a pure question of law, and *it is a pure question of law on the question of whether or not an individual who is uncompensated may be required to register and report as a legislative lobbyist* with the Missouri Ethics Commission. For the purposes of my presentation, I would like to first start with our as-applied challenge on *the compensation question*." R. Doc. 41, at 4 (emphases added).

- Calzone's suggestions-in-reply for injunctive relief stated that "Mr. Calzone simply asks that the Ethics Commission be required to determine that an individual was paid before it brands that person as an unregistered lobbyist.

Mr. Calzone would be happy to rebut any future allegation that he is being paid for his activism—as he has, in fact, done here." R. Doc. 33, at 7.

- Calzone's suggestions-in-reply further tie his challenge to compensation alone when arguing that injunctive relief against enforcement for unpaid lobbyists would not render the Ethics Commission unable to enforce its rules: "To trigger future investigations, complaints would merely have to allege that an accused legislative lobbyist is paid for his work." R. Doc. 33, at 7.

- Calzone's conclusion to his suggestions-in-reply also clearly demonstrates that he pursued his case only as it applied to him as an unpaid lobbyist: "Sixty-three years ago, the federal government sought to use a lobbying registration and reporting statute to cover the activities of unpaid individuals. The Supreme Court, applying what we would today recognize as strict scrutiny, rebuffed that effort. This court ought to do the same." R. Doc. 33, at 9.

And the district court understood Calzone's challenge to include only a challenge as an uncompensated lobbyist, something with which Calzone never voiced any objection, even on appeal:

- The district court stated in its opinion and order denying the motion for a permanent injunction that "Calzone contends that Missouri cannot require him to register as a lobbyist . . . *because he is not paid to be a lobbyist* and Missouri's definition of lobbyist is unconstitutionally vague." R. Doc. 34, at 1 (emphasis added).

- Discussing Missouri's argument that Calzone had abandoned his facial challenge, the district court stated the following, explicitly acknowledging that compensation was the only issue that formed the constitutional challenge: "Calzone suggests in his supplemental briefing, [Doc. 33] that he is merely asking that Missouri's lobbying statute should not be applied to him *unless he is paid to be a lobbyist*. In that same briefing, however, his counsel stated: 'Rather, as regards his as-applied claim, Mr. Calzone simply asks that the Ethics Commission be required *to determine* that an individual was paid before it brands that person as an unregistered lobbyist.' *Id.* at 7. As this quote shows, his counsel implicitly distinguishes between his applied challenge and his facial challenge. The Court has found no suggestion in his pleadings or elsewhere that he has abandoned his facial vagueness challenge and concludes that he seeks more than merely stopping the way the

-26-

Commission has applied the statute to an *uncompensated lobbyist*." R. Doc. 34, at 1 n.1 (emphases added).

- The district court also stated that "Calzone requests a permanent injunction prohibiting 'Defendants . . . from enforcing or threatening to enforce the disclosure requirements . . . *against those who act without being compensated*.'" R. Doc. 34, at 8 (emphasis added).

- The district court further summarized Calzone's challenge, stating: "Mr. Calzone contends that this risk of enforcement causes him irreparable harm because it is a violation of the First Amendment to subject *unpaid lobbyists* to Missouri's lobbying statutes. This contention forms the basis of Mr. Calzone's applied challenge." R. Doc. 34, at 9 (emphasis added).

Further, on appeal, the relevant portions of Calzone's brief never complained that the district court misconstrued his argument, and they raised only the issue of compensation:

- Calzone's "Statement of the Issues" raised only one issue—the same legal issue that he presented in the district court: "May the government, consistent with the First and Fourteenth Amendments to the United States Constitution, require *unpaid individuals* to comply with Missouri's registration and reporting regime for legislative lobbyists?" Appellant's Br. 1 (emphasis added).

- Calzone's "Summary of the Case" likewise described the question presented as whether an individual may be regulated as a lobbyist "even if he acts solely *as an unpaid volunteer*[.]" Appellant's Br. i (emphasis added).

- Calzone's "Summary of the Case" also objected to the district court's ruling that "Missouri could require *unpaid volunteers* to carry the same burdens as professional, *compensated* lobbyists." Appellant's Br. i (emphases added).

- Calzone's heading in the "Argument" section of his brief reads: "The district court erred in failing to apply strict scrutiny to Missouri's efforts to regulate *uncompensated volunteers* as lobbyists." Appellant's Br. 13 (emphasis added).

The record demonstrates that Calzone's argument was always understood to challenge only the law as it applied to him as an unpaid lobbyist, until oral argument before the original panel when he attempted to shoehorn a separate and distinct issue into the only issue he raised. That the majority now chooses to address this issue based on stipulations and factual assertions that are separate and apart from the issues on appeal is improper; any stipulations or factual assertions are not the same as a legal argument premised on that fact. See Anderson v. Durham D & M, LLC, 606 F.3d 513, 515 n.2 (8th Cir. 2010) (explaining that passing references are insufficient to present a legal issue for review). The majority's reliance on the stipulated facts to expand the issues is improper; it is a basic tenet of litigation that a court may address only those issues a party may raise, and it may not search the record for facts that may support what it believes to be a better claim. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."); cf. Heisler v. Metro. Council, 339 F.3d 622, 631 (8th Cir. 2003) ("It is fundamentally unfair to the nonmoving party to require her to address issues not addressed by the moving party in anticipation that the district court might rely on some unidentified issue to grant the motion.").

Calzone's failure to include a narrower as-applied challenge in his statement of the issues waived this argument. See United States v. O'Neal, 17 F.3d 239, 243 n.8 (8th Cir. 1994); United States v. Simmons, 964 F.2d 763, 777 (8th Cir. 1992). ("Issues not raised on appeal are waived under Rule 4 of the Federal Rules of Appellate Procedure, which requires the inclusion of a statement of issues in the appellate brief."). Nevertheless, the majority makes the decision to consider the issue, favoring the version of the case Calzone impermissibly adopted well after the district court ruled and after the case before this Court was fully briefed. It should be of no moment that either Calzone or the majority believes Calzone's belated expenditures argument makes a better argument on appeal. Even where the record factually supports what might be a better legal argument for reversal, it is not our place to raise it for a litigant who forfeits and waives the argument. See, e.g., Carpenter v. United States, 138 S. Ct. 2206, 2272 (2018) (Gorsuch, J., dissenting). Deciding the case based on an argument that was not properly raised either in the

district court or on appeal is unfair to the district court, which had no occasion to decide it. And with no adversarial briefing on the question, this Court is not in a good position to ensure that it is resolved correctly. Further, "[a]bsent exceptional circumstances, we cannot consider issues not raised in the district court[,]" and exceptional circumstances exist "where the obvious result would be a plain miscarriage of justice or would be inconsistent with substantial justice." See Shanklin v. Fitzgerald, 397 F.3d 596, 601 (8th Cir. 2005) (citing Gregory v. Honeywell, Inc., 835 F.2d 171, 184 (8th Cir. 1987)). Here, there are no such exceptional circumstances; Calzone merely decided mid-stream that he might have a better case if it involved expenditures.

Casting all of that aside, the majority soldiers on and decides a very different case than the one Calzone actually pursued below and on appeal. But the cases the majority relies on to expand Calzone's challenge reveal the infirmity of the ground on which the majority stands. One case, United States v. Olano, 507 U.S. 725, 731 (1993), says only that a right must be asserted in a timely manner; it sheds no light on whether Calzone properly raised a no-expenditures challenge in the district court. Another case, Universal Title Insurance Co. v. United States, 942 F.2d 1311, 1314 (8th Cir. 1991), while making reference to the consideration of a "nuance or shift in approach[,]" confirms that the dispositive inquiry is "whether the new argument is such as to raise a new issue." Here, as detailed by the numerous times in the record where Calzone limited his challenge to encompass only an uncompensated lobbyist, he most definitely attempts to raise "a new issue." And, Petaluma FX Partners, LLC v. Commissioner, 792 F.3d 72 (D.C. Cir. 2015), provides no support for the majority's contention that Missouri forfeited objection to Calzone's assertion of this new issue. Simply stated, since Calzone did not identify this narrower issue in his opening brief, there was no opportunity, indeed no reason, for Missouri to address such a new issue in its responsive briefing. Further, after the three-judge panel affirmed the district court's order, Missouri urged denial of Calzone's petition for rehearing. Missouri's argument that the court should *adhere* to the panel opinion, which concluded that Calzone raised only the uncompensated-lobbyist issue, is not

-29-

a "forfeiture" of the panel's rationale.[14]  See Anderson v. Beatrice Foods Co., 900 F.2d 388, 397 (1st Cir. 1990) ("[A]n appellant's brief on appeal fixes the scope of issues appealed so that an appellant cannot resurrect an omitted claim merely by referring to it in a reply brief or at oral argument. . . . A fortiori, a party cannot be permitted to raise a new issue for the first time on a petition for rehearing in the court of appeals." (internal quotation marks omitted)) (cited with approval by U.S. Fidelity & Guar. Co. v. Concrete Holding Co., 168 F.3d 340, 342 (8th Cir. 1999) and In re Hen House Interstate, Inc., 177 F.3d 719, 724-25 (8th Cir. 1999)).  Finally, Citizens United v. Federal Election Commission, 558 U.S. 310 (2010), provides no support for the majority's analysis, as there the Supreme Court merely confirmed that "[o]ur practice permits review of an issue not pressed below *so long as it has been passed upon*."  Id. at 330 (emphasis added) (internal quotation marks and brackets omitted).  Clearly, neither the district court nor the panel passed on the more narrow no-expenditures issue, and only the uncompensated lobbyist issue was addressed.

The majority also sprinkles in other inapposite cases that do nothing to advance its point: the "forfeiture" that the party "forfeited" in Robertson v. U.S. Bank, N.A., 831 F.3d 757, 764 (6th Cir. 2016), was the right to foreclose on a mortgage, with the court acknowledging the forfeiture was based, in part, on the fact that the district court did not address the argument; United States v. Jones, 152 F.3d 680, 684 n.2 (7th Cir. 1998), considers the government's failure to respond with a forfeiture argument in its response brief after the defendant raised, in his opening brief alleging ineffective assistance of counsel, an issue not brought before the district court; and Tibble v. Edison International, 843 F.3d 1187, 1193 (9th Cir. 2016) (en banc), and Cook v. Rockwell International Corp., 618 F.3d 1127, 1138-

---

[14]Whatever was said in the spur of the moment during the back and forth of oral argument, three essential facts remain: (1) the only issue presented to and decided by the district court was the unpaid lobbyist issue; (2) Calzone's Statement of the Issue on appeal in his opening brief was also limited to the unpaid lobbyist question; and (3) the majority's use of the en banc process to reverse a judgment based on a novel constitutional issue that was not addressed by either a district court or a three-judge panel is unwise and extraordinary.

39 (10th Cir. 2010) similarly involved issues that had been raised in the opening brief, not for the first time at oral argument. While the majority has indeed found cases that use the phrase "forfeited forfeiture," they are in no way analogous to Calzone's case.

## B.

Deciding this appeal on the single issue Calzone presented—whether the lobbying disclosure law can constitutionally apply to him as an unpaid lobbyist—I conclude that it can. Calzone's challenge is subject to exacting scrutiny, which "requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 875 (8th Cir. 2012) (en banc) (internal quotation marks omitted).[15]

First, Missouri has a sufficiently important governmental interest in having unpaid lobbyists register: Missouri's stated interest in transparency, namely avoiding the fact or appearance of public corruption and knowing who is attempting to influence legislators, legislation, or public policy.[16] The Supreme Court and this

---

[15]The majority questions whether exacting scrutiny really applies to Calzone's challenge, ultimately concluding that it does not matter whether exacting or strict scrutiny applies because Missouri fails to satisfy the lesser standard. I would not be so equivocal. In Minnesota Citizens Concerned for Life, Inc. v. Swanson, we held that "[l]aws that burden political speech are [generally] subject to strict scrutiny, . . . [b]ut this is not true when the law at issue is a disclosure law, in which case it is subject to exacting scrutiny." 692 F.3d 864, 874-75 (8th Cir. 2012) (en banc) (first alteration in original) (internal quotation marks omitted). Because the statute at issue here is a disclosure statute, as the majority recognizes, exacting scrutiny applies.

[16]The majority acts as if this stated interest is some unclear, amorphous concept, but goes on to acknowledge precisely what Missouri asserts this interest entails. The fact that the majority so easily understands Missouri's stated interest undercuts its purported rationale that there can be no sufficiently important governmental interest because Missouri has left it broad and undefined.

court have long recognized the "vital national interest" in requiring the disclosure of lobbying activities. United States v. Harriss, 347 U.S. 612, 625 (1954); Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n, 761 F.2d 509, 512 (8th Cir. 1985) (per curiam). Indeed, our Court has previously upheld statutes requiring lobbyists to register, even under a more stringent strict scrutiny standard. See NRA, 761 F.2d at 512 (upholding lobbying registration law as it applied to the NRA's "communication with lawmakers through an artificially stimulated letter campaign" because those communications were a lobbying activity). As the appropriate standard is now exacting scrutiny, Missouri, rather than having a compelling interest, need only have a sufficiently important interest. See Swanson, 692 F.3d at 874-75. Thus, if the interest in having lobbyists register their activities is a compelling interest, it is certainly also a sufficiently important interest.

Calzone argues that the reasoning of Harriss and NRA should not apply to his challenge because he is unpaid, and the government does not have a sufficiently important interest with respect to unpaid lobbyists. But I believe the distinction between paid and unpaid lobbyists does not alter the equation so significantly. The Supreme Court in Harriss described the "vital national interest" in disclosure as follows:

> Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal.

Harriss, 347 U.S. at 625.

Although the statute at issue in Harriss governed only paid lobbyists, the interest described by the Court applies just as well to unpaid lobbying activity. In NRA, we held that the activity that warranted lobbyist registration and reporting

requirements was the NRA executive director's mailing of letters to Minnesota residents asking them to contact their legislators and urge them to vote a specific way. 761 F.2d at 511. This activity standing alone, without regard to any campaign contributions the NRA made or to the fact that the executive director received compensation from the NRA, warranted imposing registration requirements on the director. See id. at 512; see also Fla. Ass'n of Prof'l Lobbyists, Inc. v. Div. of Legislative Info. Servs., 525 F.3d 1073, 1080 (11th Cir. 2008) (per curiam) (holding that "the state has a compelling interest in self-protection in the face of coordinated pressure campaigns directed by lobbyists . . . [and] allow[ing] voters to appraise the integrity and performance of officeholders and candidates, in view of the pressures they face" (internal quotation marks omitted)); SpeechNow.org v. Fed. Election Comm'n, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc) (stating that "[b]ecause disclosure requirements inhibit speech less than do contribution and expenditure limits, the Supreme Court has not limited the government's acceptable interests to anti-corruption alone[, and i]nstead, the government may point to any sufficiently important governmental interest" (internal quotation marks omitted)); Smith v. City of San Jose, No. H037626, 2013 WL 6665712, at *8 (Cal. Ct. App. Dec. 17, 2013) (applying Harriss to uphold registration and disclosure requirements for unpaid lobbyists).

I conclude that Missouri's stated interest in transparency is a sufficiently important governmental interest: avoiding the fact of, or even the appearance of, public corruption and knowing who exactly is trying to influence legislators, legislation, or public policy.

I also conclude that the statutory registration requirements are substantially related to Missouri's transparency interest. Swanson, 692 F.3d at 876 ("[T]here must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed . . . ." (internal citation omitted)). Disclosure laws that have no more than a tenuous relationship to the interest served by disclosure cannot satisfy exacting scrutiny; something more is

required: "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." Id. (internal citation omitted).

The regulation requires lobbyists to register annually; submit forms detailing the names and addresses of all lobbyists, persons employed by lobbyists for lobbying purposes, and each lobbyist principal for whom the lobbyist is employed "or in whose interest such lobbyist appears or works"; pay a $10 filing fee; and file monthly reports. Mo. Rev. Stat. § 105.473. These requirements are directly related to Missouri's interest in knowing who is attempting to influence legislation as a lobbyist and its interest in avoiding the fact or appearance of corruption. And these burdens are not so onerous that they outweigh Missouri's transparency interests. Despite the majority's exaggerated description of these obligations as "a maze of legal requirements," the burdens are minimal: they take little time, effort, and money to complete and need only be completed in the months or years in which Calzone actually engages in lobbying activities. And if he does not want to comply, Calzone is free to pull himself outside of the ambit of the law by appearing in front of the legislature individually, as he has been doing during the pendency of this suit.

Any concern with Calzone giving up his anonymity is similarly frail: if Calzone truly wants to be a politically active citizen and remain anonymous, he can. Calzone does not resemble the citizen who distributed anonymous leaflets to persons attending a public meeting at a middle school in McIntyre v. Ohio Elections Commission, 514 U.S. 334 (1995). She sought to place handbills on car windshields in a school parking lot without identifying herself as the author of the literature. Calzone seeks no such anonymity. He appears openly before legislators in an effort to influence their votes. Calzone never even mentions an interest in anonymity in his appellate briefs. If anything, he seeks only to hide his efforts on behalf of Missouri First from other legislators and from the Missouri citizenry. But Calzone is not entitled to be an "anonymous" lobbyist, just because he is unpaid, while other lobbyists who attempt to influence public policy by bringing to bear the pressure of their organizations are required to register.

-34-

Because the requirements of the disclosure law are directly related to Missouri's transparency interest and impose a burden that is not disproportionate to that interest, the statute is substantially related to Missouri's sufficiently important governmental interest, satisfying exacting scrutiny and surviving Calzone's constitutional challenge.

## III.

The state of Missouri, as well as its citizens, have a significant interest in understanding just exactly who is attempting to influence Missouri's legislation and how. Missouri's lobbying disclosure law addresses the concerns and imposes a minimal burden on lobbyists, even where, like Calzone, they are unpaid. Despite the majority's efforts to transform this case into something it is not and has never been, I would address only the case before us—a challenge to the law as applied to unpaid lobbyists—and would affirm the district court's denial of a permanent injunction. I respectfully dissent.

_____