Sullivan v New York State Joint Commn. on Pub. Ethics (2022 NY Slip Op 03553)





Sullivan v New York State Joint Commn. on Pub. Ethics


2022 NY Slip Op 03553


Decided on June 2, 2022


Appellate Division, Third Department


Pritzker, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:June 2, 2022

532733

[*1]Katherine C. Sullivan et al., Appellants,
v
New York State Joint Commission on Public Ethics et al., Respondents.

Calendar Date:April 21, 2022

Before: Clark, J.P., Pritzker, Colangelo and McShan, JJ.


Government Justice Center, Inc., Albany (Cameron J. Macdonald of counsel), for appellants.
Letitia James, Attorney General, Albany (Beezly J. Kiernan of counsel), for respondents.


Pritzker, J.
Appeal from an order and judgment of the Supreme Court (Corcoran, J.), entered December 3, 2020 in Albany County, which granted defendants' motion to dismiss the amended complaint.
In 2018, the Legislature was considering the Child Victims Act (see L 2019, ch 11 [hereinafter the CVA]), which prospectively extended the statutes of limitations for civil and criminal actions and temporarily revived otherwise time-barred civil actions related to sexual offenses against a child. Plaintiff Katherine C. Sullivan, a resident of Florida, supported the CVA and expressed that support, among other ways, through a website that explained that Sullivan was a survivor of child sexual assault that she was subjected to while attending a school in the City of Troy, Rensselaer County, but that she was barred from seeking legal recourse by then-applicable statutes of limitations. A list of state senators who opposed the CVA was provided, along with a script and postcard template for website visitors to contact state senators to voice support for the CVA. Sullivan also rented digital billboard space in this state that displayed a rotating set of screens, one of which purportedly read, "NY Pass the Child Victims Act," and another that displayed photographs of state senators next to text asking why they did not support the CVA. Some of the screens also purportedly displayed Sullivan's website address; all of the screens indicated that they were paid for by plaintiff Kat Sullivan LLC (hereinafter the LLC). Sullivan later arranged for an airplane to circle the Capitol and the school in Troy towing banners that displayed, among other things, the address of her aforementioned website and the hashtag #NYPASSCVA.
Defendant New York State Joint Commission on Public Ethics (hereinafter JCOPE) was, during the relevant time period, charged by statute with administration and enforcement of the Lobbying Act (see Legislative Law art 1-A).[FN1] The Lobbying Act requires individuals and organizations engaged in lobbying to register with JCOPE and submit periodic reports on such activity (see Executive Law § 94 [1]; Legislative Law §§ 1-c [a], [b];
1-d [a]; 1-e [a] [3] [ii]; [c]; 1-h [a]; 1-j [a]; see also Matter of New York Temporary State Commn. on Lobbying v Crane, 49 AD3d 1066, 1066 [2008]). Commencing in June 2018, JCOPE notified plaintiffs that their efforts in support of the CVA may require them to register and begin reporting pursuant to the Lobbying Act or explain in writing why they should not be required to do so. Plaintiffs resisted, and JCOPE formally notified them that they had allegedly violated the Lobbying Act by failing to register and report their activity. Plaintiffs still did not cooperate, claiming, among other things, that they did not meet the reporting threshold or the definition of lobbyists. In December 2019, JCOPE notified plaintiffs that, although its records indicated a likely violation of the Lobbying Act, it was exercising its discretion to forgo [*2]"continued investigation and enforcement" and, instead, issue guidance and "regulatory clarification." Consequently, JCOPE did not take any further action against plaintiffs with respect to their attempts to influence passage of the CVA, but warned plaintiffs that, if they undertook any future activity covered by the Lobbying Act, the registration and reporting requirements would again be triggered, as well as the attendant policies for noncompliance.
In February 2020, plaintiffs filed an amended complaint against JCOPE and the Chair of JCOPE, asserting four causes of action and seeking, among other things, a multi-part declaration that the Lobbying Act was unconstitutional on its face and as applied to plaintiffs, that certain lobbying regulations were unconstitutional and promulgated without legislative authority and that, in 2018, plaintiffs did not engage in lobbying activity and were not lobbyists.[FN2] Defendants filed a pre-answer motion to dismiss the amended complaint, arguing that plaintiffs' facial challenges to the Lobbying Act and lobbying regulations failed to state a claim and that their as-applied challenge was not ripe for judicial review in the absence of a determination by JCOPE that plaintiffs were lobbyists engaged in lobbying. Plaintiffs opposed. Following defendants' reply, oral argument and supplemental briefing, Supreme Court granted defendants' motion and dismissed the amended complaint, holding that the Lobbying Act was not facially unconstitutional. Furthermore, the court agreed with defendants that plaintiffs' remaining causes of action were nonjusticiable. Plaintiffs appeal.
Before analyzing the procedural and substantive issues, a nuts-and-bolts review of the Lobbying Act is required. Generally, the Lobbying Act applies to "any attempt to influence" state or local legislation, executive action, regulation, rulemaking, ratemaking and procurement (Legislative Law § 1-c [c]). Citing United States v Harriss (347 US 612 [1954]), defendants assert that JCOPE has constructively narrowed application of the Lobbying Act to (1) direct contact with government officials and bodies and (2) campaigns to encourage others to make direct contact with government officials and bodies. Oversight of the second type of activity, which JCOPE calls "grassroots lobbying," purportedly derives from the "artificially stimulated letter campaign" that the Supreme Court of the United States, in United States v Harriss (id. at 620), determined could be permissibly regulated by the federal lobbying statute at issue in that case. Defendants attached to their motion a 2016 advisory opinion issued by JCOPE setting out the requirements for a grassroots lobbying communication as one that (1) "[r]eferences, suggests, or otherwise implicates an activity covered by [Legislative Law § 1-c (c)]"; (2) "[t]akes a clear position on the issue in question"; and (3) "[i]s an attempt to influence a public official through a call to action, i.e., solicits or [*3]exhorts the public, or a segment of the public, to contact [a] public official[ or officials]." In 2019, JCOPE promulgated lobbying regulations (see 19 NYCRR part 943), which purportedly "serve[d] to codify the constitutional authority to regulate grassroots lobbying" (19 NYCRR 943.1 [a]). The lobbying regulations include the definition of grassroots lobbying communication detailed in the 2016 advisory opinion (see 19 NYCRR 943.7 [b] [2]), and further specify that such grassroots lobbying communication may be through letter writing campaigns or, among other things, billboards, print media advertisements, websites and social media communications (see 19 NYCRR 943.7 [g] [1]).
The Lobbying Act further states that "every person or organization retained, employed or designated by any client to engage in lobbying" is a "lobbyist" (Legislative Law § 1-c [a]). To complete the circle, a "client" is "every person or organization who retains, employs or designates any person or organization to carry on lobbying activities on behalf of such client" (Legislative Law § 1-c [b]). Lobbyists and clients are subject to JCOPE's jurisdiction (see Executive Law § 94 [1]). At oral argument in Supreme Court, defendants represented that, based on JCOPE's interpretation of the statute, a lobbyist and client could be the same person or entity — that is, a lobbyist engaged in lobbying on her or his own behalf. JCOPE codified this interpretation in the lobbying regulations under the term "[d]esignated [l]obbyist" (19 NYCRR 943.3 [g] [1]). The regulations were amended in 2020 to specifically hold that one who publishes a grassroots lobbying communication is engaged in grassroots lobbying on her or his own behalf and, thus, is her or his own designated lobbyist (see 19 NYCRR 943.7 [c] [1]; compare 19 NYCRR 943.7 [former (c)]). That particular provision includes as its example "a person who buys billboard space that includes a [g]rassroots [l]obbying [c]ommunication" (19 NYCRR 943.7 [c] [1] [i]).
Every lobbyist who anticipates spending or receiving $5,000 or more annually for the purpose of lobbying, or actually does so receive or spend, must register with and submit bimonthly reports to JCOPE, and, with some exceptions, every client who reasonably anticipates spending $5,000 or more annually on lobbying must submit semiannual reports to JCOPE (see Legislative Law §§ 1-e [a] [3] [ii]; [c]; 1-h [a]; 1-j [a]). Lobbyists and clients who meet the reporting threshold must reveal to JCOPE, essentially but among other things, each other's identities; the subject matter of the lobbying; the officials, bodies or agencies lobbied; and the amount of money spent on those efforts (see Legislative Law §§ 1-e [c]; 1-h [b]; 1-j [b]). Knowing and willful failure to timely register or submit a report required by the Lobbying Act could result in civil and criminal penalties (see Legislative Law § 1-o [a], [b]).
JCOPE may, on its own initiative, investigate possible violations of the [*4]Lobbying Act, which includes notice to the subject of the investigation and an opportunity for written response (see Executive Law § 94 [13] [a]). JCOPE members may then vote to "commence a full investigation . . . to determine whether a substantial basis exists to conclude that a violation of law has occurred" (Executive Law § 94 [13] [a]; see Executive Law § 94 [13] [b]). Following a hearing before an independent hearing officer, JCOPE votes on whether to issue a substantial basis investigation report, impose a civil penalty and/or refer to the appropriate agency for prosecution (see Executive Law § 94 [14-c]; Legislative Law § 1-p [b]; 19 NYCRR 941.13 [a], [c]). The outcome of the substantial basis investigation is subject to review in a CPLR article 78 proceeding (see Executive Law § 94 [14]). Apart from such adjudicatory proceedings, any person may request an advisory opinion from JCOPE concerning application of the Lobbying Act or lobbying regulations to a hypothetical set of facts (see Legislative Law § 1-d [f]; see also Executive Law § 94 [9] [m]).
Within this statutory context, we turn to plaintiffs' facial challenges to the Lobbying Act, asserting first that it is unconstitutional under the First Amendment and, second, that it is unconstitutionally vague and overbroad. Although substantively these two theories will be treated separately, we begin with the rules governing this common procedural setting. It is well settled that "[i]n a civil action, a motion to dismiss pursuant to CPLR 3211 (a) (7) requires the court to give the pleading a liberal construction, accept the facts alleged in the complaint to be true and afford the plaintiff the benefit of every possible favorable inference, and to dismiss the pleading if, upon that analysis, it fails to state a cause of action" (Dodson v Town Bd. of the Town of Rotterdam, 182 AD3d 109, 112 [2020] [internal quotation marks and citations omitted]). "Specifically, with regard to a pre-answer motion to dismiss a declaratory judgment action, the only issue presented for consideration is whether a cause of action for declaratory relief is set forth, not whether the plaintiff is entitled to a favorable declaration" (Matter of Dashnaw v Town of Peru, 111 AD3d 1222, 1225 [2013] [internal quotation marks, ellipsis and citations omitted]). Upon such a motion, "a court may reach the merits of a properly pleaded cause of action for a declaratory judgment where no questions of fact are presented by the controversy" (North Oyster Bay Baymen's Assn. v Town of Oyster Bay, 130 AD3d 885, 890 [2015] [internal quotation marks, brackets and citations omitted]). "Under such circumstances, the motion to dismiss the cause of action for failure to state a cause of action should be taken as a motion for a declaration in the defendant's favor and treated accordingly" (Minovici v Belkin BV, 109 AD3d 520, 524 [2013] [internal quotation marks and citations omitted]; see Dodson v Town Bd. of the Town of Rotterdam[*5], 182 AD3d at 112).
"[L]egislative enactments are entitled to a strong presumption of constitutionality, and courts strike them down only as a last unavoidable result after every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible. Thus, while the presumption of constitutionality is not irrefutable, as the part[ies] challenging a duly enacted statute, plaintiffs face the initial burden of demonstrating [the Lobbying Act's] invalidity beyond a reasonable doubt. Moreover, as the part[ies] mounting a facial challenge to [the Lobbying Act], plaintiffs bear the substantial burden of demonstrating that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (White v Cuomo, ___ NY3d ___, 2022 NY Slip Op 01954, *4 [2022] [internal quotation marks, brackets and citations omitted]).
Turning specifically to the first facial challenge, the First Amendment protects, among other rights, "the freedom of speech . . . and to petition the [g]overnment for a redress of grievances" (US Const 1st Amend; see NY Const, art I, §§ 8, 9 [1]). The right to petition "protects 'a particular freedom of expression,'" and, as such, "it is analyzed according to the same constitutional principles that apply to the right of free speech" (Board of Trustees of the Vil. of Groton v Pirro, 152 AD3d 149, 157 [2017], quoting McDonald v Smith, 472 US 479, 482 [1985]). "Regulations that burden political speech must typically withstand strict scrutiny" (Gaspee Project v Mederos, 13 F4th 79, 84 [1st Cir 2021], cert denied ___ US ___ [Apr. 25, 2022]; see Citizens United v Federal Election Comm'n, 558 US 310, 340 [2010]). The Lobbying Act, however, does not directly burden speech but instead requires disclosure of certain activity (see generally Legislative Law §§ 1-e, 1-h, 1-j). Accordingly, Supreme Court correctly concluded that the Lobbying Act is subject to exacting scrutiny rather than strict scrutiny (see Americans for Prosperity Foundation v Bonta, 594 US ___, ___, 141 S Ct 2373, 2382-2383 [2021]; Calzone v Summers, 942 F3d 415, 423 [8th Cir 2019 en banc]). This "standard requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights" (Doe v Reed, 561 US 186, 196 [2010] [internal quotation marks and citations omitted]). "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest" (Americans for Prosperity Foundation v Bonta, 141 S Ct at 2383).
As defendants maintain, the state has an interest "in providing the public and government officials with knowledge regarding the source and amount of pressure [*6]on government officials" (Commission on Ind. Colls. & Univs. v New York Temporary State Commn. on Regulation of Lobbying, 534 F Supp 489, 498 [ND NY 1982]; see Legislative Law § 1-a). Indeed, it is well established that an informational interest, grounded in "maintain[ing] the integrity of a basic governmental process," is substantial enough to withstand the scrutiny that attends mandatory disclosure regimes that indirectly burden protected speech (United States v Harriss, 347 US at 625; accord Florida League of Professional Lobbyists, Inc. v Meggs, 87 F3d 457, 460 [11th Cir 1996], cert denied 519 US 1010 [1996]; see National Assn. of Mfrs. v Taylor, 582 F3d 1, 13-14 [DC Cir 2009]; Minnesota State Ethical Practices Bd. v National Rifle Assn. of Am., 761 F2d 509, 512 [8th Cir 1985], cert denied 474 US 1082 [1986]).
Consistent with Supreme Court's analysis, the Lobbying Act itself is narrowly tailored and thus passes exacting scrutiny because it (1) targets only advertent efforts to influence government and those who engage in such efforts, (2) exempts individuals and organizations who do not spend or receive a substantial sum to engage in such efforts, (3) requires only periodic disclosure of those efforts and (4) penalizes only intentional failure to comply with its mandate (see United States v Harriss, 347 US at 625-626; Commission on Ind. Colls. & Univs. v New York Temporary State Commn. on Regulation of Lobbying, 534 F Supp at 498).[FN3] Plaintiffs urge this Court to reject JCOPE's interpretation of the Lobbying Act and resort to the bare text of the statute, which, in their reading, contains no language limiting it to applications sanctioned by United States v Harriss. This Court need not defer to JCOPE's construction as this is a matter of pure statutory interpretation and does not require "knowledge of underlying operational practices or the evaluation of factual data and rational inferences" (Hollandale Apts. & Health Club, LLC v Bonesteel, 173 AD3d 55, 67 [2019]). Nevertheless, "a statute should be construed, whenever possible, in a way that avoids placing its constitutionality in doubt" (People v Viviani, 36 NY3d 564, 579 [2021]). Given the availability of JCOPE's reasonable saving construction, this Court declines plaintiffs' invitation to hold the Lobbying Act facially unconstitutional based on an unnecessarily expansive reading (see People ex rel. Guggenheim v Mucci, 32 NY2d 307, 311-312 [1973]).
Plaintiffs also assert that state regulation of First Amendment rights based on mere influence upon government cannot withstand scrutiny because states have no compelling interest in the exchange of ideas or influence broadly, and instead must narrowly tailor their disclosure regimes to combat quid pro quo corruption and promote transparency. Even if true, Supreme Court aptly noted that the Lobbying Act applies only when qualified compensation or expenditures reach $5,000. For that reason, even assuming the state categorically has no substantial [*7]interest in "mere influence" — a proposition that seems better suited for regimes directly burdening political speech (compare McCutcheon v Fed. Election Comm'n, 572 US 185, 192, 208 [2014]) — the Lobbying Act would still be narrowly tailored to attempts to influence legislation and other similar governmental acts where "money changes hands," which the state could reasonably conclude increases "the risk of quid pro quo corruption" (Calzone v Summers, 942 F3d at 425; cf. United States v Harriss, 347 US at 625). Additionally, there has been no showing by reference to the amended complaint or otherwise "that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (White v Cuomo, 2022 NY Slip Op 01954 at *4 [internal quotation marks and citations omitted]). Thus, plaintiffs' initial facial attack on the constitutionality of the Lobbying Act fails.
Next, we address plaintiffs' challenge to the Lobbying Act as unconstitutionally vague and overbroad. "A regulation of speech is overbroad if constitutionally-protected expression may be 'chilled' by the provision because it facially 'prohibits a real and substantial amount of' expression guarded by the First Amendment" (People v Marquan M., 24 NY3d 1, 8 [2014], quoting People v Barton, 8 NY3d 70, 75 [2006]). "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (United States v Stevens, 559 US 460, 473 [2010] [internal quotation marks and citation omitted; emphasis added]; see Board of Trustees of the Vil. of Groton v Pirro, 152 AD3d at 156). "The overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists" (Virginia v Hicks, 539 US 113, 122 [2003] [internal quotation marks, brackets and citation omitted]). Moreover, facial overbreadth will not compel invalidation "when a limiting construction has been or could be placed on the challenged statute" (Broadrick v Oklahoma, 413 US 601, 613 [1973]).
Plaintiffs' overbreadth theory proceeds from their proposition, purportedly derived from United States v Harriss (347 US at 620), that the government can only regulate "lobbying in its 'commonly accepted sense' — direct communication with [government officials] on pending or proposed legislation." Ergo, in their view, the possibility that the statute could reach any indirect communication or activity by individuals and entities with only the incidental purpose of influencing legislation renders it facially overbroad. However, United States v Harriss does not define the universe of permissible lobbying regulations and, contrary to plaintiffs' view, the First Amendment tolerates disclosure regimes such as the Lobbying Act (see e.g. Minnesota State Ethical Practices Bd. v National Rifle Assn. of Am., 761 F2d at 510-511, 513).
Plaintiffs also posit that the Lobbying Act [*8]reaches "any discussion or activity regarding the pros and cons of any government action that may influence said action," and thereby chills a substantial amount of protected speech. Such a concern is belied by the statute itself, which is triggered by an "attempt to influence" legislation or some other enumerated government act (Legislative Law § 1-c [c] [emphasis added]) — implying a specific intent to advocate and ruling out inadvertency (compare Penal Law § 110.00). Furthermore, to arrive at the conclusion that the Lobbying Act is unconstitutionally overbroad, plaintiffs impermissibly forgo attempting to apply a construction that avoids invalidity (see Broadrick v Oklahoma, 413 US at 613). Here, again, JCOPE's construction of the statute with respect to indirect lobbying requires the communication to contain, among other things, information related to the targeted government act and a call to others to make direct contact with public officials (see e.g. id.). Given the availability of this construction and the further restriction imposed by the $5,000 threshold for reporting, Supreme Court correctly determined that plaintiffs failed to state a cause of action based on unconstitutional overbreadth.
For similar reasons, plaintiffs' facial challenge to the Lobbying Act as unconstitutionally vague also fails to state a cause of action. "[T]he void-for-vagueness doctrine protects against the ills of a law that fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement" (Center for Individual Freedom v Madigan, 697 F3d 464, 478-479 [7th Cir 2012] [internal quotation marks and citation omitted]; see Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs., 195 AD3d 83, 87 [2021]). Here, plaintiffs essentially assert that the definitions of lobbying and lobbyist are so opaque and so susceptible to abusive enforcement that they bring down the entire Lobbying Act. Yet, a person of ordinary intelligence who is employed by a client and engaged in direct contact with legislators about a bill would understand himself or herself to be a lobbyist engaged in lobbying and subject to the Lobbying Act (see Legislative Law § 1-c [a], [b], [c]; cf. Police Conference of N.Y. v Kreutzer, 91 AD2d 735, 736 [1982], lv denied 59 NY2d 603 [1983]). The gravamen of plaintiffs' vagueness challenge is that, in certain circumstances — for example, grassroots lobbying on one's own behalf — persons to whom the act applies would not understand themselves to be lobbyists or that their activities constitute lobbying, unwittingly putting them in peril of an enforcement action for failing to register and report. This is insufficient for facial invalidity, which requires a "showing that the statute is impermissibly vague in all of its applications" (People v Stuart, 100 NY2d 412, 421 [2003]).[FN4] Thus, because plaintiffs [*9]cannot establish vagueness in all applications of the challenged provisions, their facial challenge to the Lobbying Act based on that doctrine fails (see id.). Given the foregoing, defendants are entitled to a declaration that the Lobbying Act is not facially unconstitutional.
We next examine plaintiffs' second and third causes of action seeking a declaration that the Lobbying Act as applied against them was unconstitutional, which Supreme Court dismissed as unripe. Plaintiffs contend that their as-applied challenge is ripe for judicial review because JCOPE, by way of its December 2019 guidance letter and the lobbying regulations, has taken a final position that plaintiffs' activity is governed by the Lobbying Act, inflicting an actual, concrete injury through its threat of enforcement of the Lobbying Act. Initially, the justiciability issue here invokes two related doctrines: (1) whether plaintiffs have presented an actual controversy between disputing parties with a "stake in the outcome" and (2) whether such controversy is ripe for judicial review (Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510, 518 [1986] [internal quotation marks and citation omitted], cert denied 479 US 985 [1986]; see Susan B. Anthony List v Driehaus, 573 US 149, 158 [2014]; New York Civ. Liberties Union v Grandeau, 528 F3d 122, 131 [2d Cir 2008]). "A controversy is justiciable when the plaintiff in an action for a declaratory judgment has an interest sufficient to constitute standing to maintain the action" (Matter of Acevedo v New York State Dept. of Motor Vehs., 132 AD3d 112, 116 [2015] [internal quotation marks and citations omitted], affd 29 NY3d 202 [2017]). To establish standing in a pre-enforcement challenge under the First Amendment, courts recognize two types of injuries. "The first is when 'the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute, and there exists a credible threat of prosecution'" (Mangual v Rotger-Sabat, 317 F3d 45, 56-57 [1st Cir 2003] [brackets omitted], quoting Babbitt v United Farm Workers Natl. Union, 442 US 289, 298 [1979]). "The second type of injury is when a plaintiff is chilled from exercising her [or his] right to free expression or forgoes expression in order to avoid enforcement consequences" (Mangual v Rotger-Sabat, 317 F3d at 57 [internal quotation marks and citations omitted]).
A determination as to whether a controversy is ripe for review requires a court "first to determine whether the issues tendered are appropriate for judicial resolution, and second to assess the hardship to the parties if judicial relief is denied" (Church of St. Paul & St. Andrew v Barwick, 67 NY2d at 519 [internal quotation marks and citation omitted]; see National Park Hospitality Assn. v Department of Interior, 538 US 803, 808 [2003]). "The appropriateness inquiry looks to whether the administrative action being reviewed is final and whether [*10]the controversy may be determined as a purely legal question. The concept of finality requires an examination of the completeness of the administrative action and a pragmatic evaluation of whether the decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury" (Church of St. Paul & St. Andrew v Barwick, 67 NY2d at 519 [internal quotation marks and citations omitted]). The hardship prong, "from the standpoint of the challenging party, entails an examination of the certainty and effect of the harm claimed to be caused by the administrative action: whether it is sufficiently direct and immediate and whether the action's effects have been felt in a concrete way. If the anticipated harm is insignificant, remote or contingent[,] the controversy is not ripe" (id. at 520 [internal quotation marks, brackets and citations omitted]).
The December 2019 guidance letter from JCOPE's general counsel, issued to plaintiffs in lieu of continued enforcement of the Lobbying Act, sets out "the relevant facts" that are "[b]ased upon information obtained by [JCOPE]." "In sum," the guidance letter expressed that JCOPE had "reason to believe" that plaintiffs "spent more $5,000 in reportable lobbying expenditures and thus may have been required to register as a lobbyist." The amended complaint alleged that "[t]his issue is real" because the 2019 guidance letter warned Sullivan "that her future advocacy activity would trigger [JCOPE's] reporting requirements," described as "extensive." Plaintiffs further alleged that Sullivan "lives under the threat of being assessed massive civil penalties by [JCOPE] for not meeting its unconstitutional registering and reporting requirements." According to plaintiffs, JCOPE "harassed" Sullivan "for more than a year" with "letters, emails and telephone calls" — sometimes with multiple telephone calls per day to her and her significant other. Plaintiffs also alleged that JCOPE subpoenaed records from the digital billboard company and the airport that they used for their CVA advocacy. Plaintiffs asserted that Sullivan was unable to use an airport for a second airplane banner flight because the State Police contacted the airport about an earlier banner flight at JCOPE's request. Plaintiffs represented during oral argument before Supreme Court and in their supplemental briefing that their speech is chilled by JCOPE's demand that they register as lobbyists.
Also, during oral argument, defendants informed Supreme Court that JCOPE's jurisdiction lasts one year after an individual "would have been required to file." Executive Law § 94 (13) (c) explicitly extends JCOPE's jurisdiction over lobbyists even after they cease acting as such. As the court observed, although that statute cuts off JCOPE's jurisdiction one year after the last filing of a lobbyist, it is silent as to the point in time after which JCOPE is barred from enforcing the Lobbying Act against a lobbyist who never filed in [*11]the first place (see Executive Law § 94 [13] [c]). Furthermore, during oral argument, defendants confirmed that JCOPE ceased its investigation "without prejudice" to an investigation for future "similar conduct," and they also appear to have stated that JCOPE retained authority to reopen the investigation into plaintiffs' 2018 CVA activities because JCOPE was "not aware of the full universe of facts that might be out there." In their supplemental briefing, defendants stated that JCOPE no longer has jurisdiction to investigate potential violations "beyond those of which it has already stated it will not take further action" — in other words, defendants do not appear to have concretely disavowed jurisdiction to reopen its investigation into plaintiffs' 2018 CVA activities.
Initially, a justiciable controversy arose when JCOPE, by way of the December 2019 guidance letter, determined that plaintiffs' CVA activities were covered by the Lobbying Act and lobbying regulations and, citing to those authorities, imposed on plaintiffs the duty to register and report any future similar activities (see New York Civ. Liberties Union v Grandeau, 528 F3d at 131). The amended complaint refers to the reporting burdens that would attend Sullivan's future advocacy activity, and plaintiffs' representations at oral argument and in supplemental briefing clarify that such burdens chill Sullivan's free speech. JCOPE's attempt to enforce the Lobbying Act against plaintiffs' CVA activity, coupled with its warning to plaintiffs to comply with the Lobbying Act in the future, demonstrates "the existence of a credible threat that the challenged law will be enforced," which is sufficient to establish the injury required for a justiciable controversy (Mangual v Rotger-Sabat, 317 F3d at 57 [internal quotation marks and citation omitted]; compare Laird v Tatum, 408 US 1, 13-14 [1972]; cf. Uzuegbunam v Preczewski, 592 US ___, ___, 141 S Ct 792, 797 [2021]).
Next, we turn to ripeness and consider the appropriateness prong of the inquiry and its concomitant condition of finality. Notably, when "an agency's action is challenged as either unconstitutional or wholly beyond its grant of power," a challenger need not exhaust administrative remedies before seeking judicial review (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57 [1978]). That said, "a determination will not be deemed final because it stands as the agency's last word on a discrete legal issue that arises during an administrative proceeding. There must additionally be a finding that the injury purportedly inflicted by the agency may not be 'prevented or significantly ameliorated by further administrative action or by steps available to the complaining party'" (Matter of Essex County v Zagata, 91 NY2d 447, 453 [1998], quoting Church of St. Paul & St. Andrew v Barwick, 67 NY2d at 520).
Broadly speaking, the two discrete legal issues comprising plaintiffs' as-applied claims are that the First Amendment prohibits [*12]classifying (1) their activities as lobbying and (2) them as lobbyists, as those terms are defined by the Lobbying Act. As plaintiffs observed in opposition to defendants' motion, JCOPE, through the 2019 guidance letter, unequivocally concluded that the airplane banner and "some" of the billboard displays were grassroots lobbying covered by the Lobbying Act. Moreover, JCOPE has promulgated a regulation codifying its questionable legal conclusion that under the Lobbying Act a lobbyist and a client can be one and the same (see 19 NYCRR 943.3 [g] [1]), and have advanced this position as to plaintiffs.[FN5] Of course, by halting the investigation, JCOPE cut off plaintiffs' ability to request further administrative review (compare Matter of Putnam v City of Watertown, 213 AD2d 974, 974-975 [1995]). As such, JCOPE has staked out a definite position on whether plaintiffs' billboards and airplane banner were lobbying activities pursuant to the Lobbying Act and whether a lobbyist and a client can be the same person, thus presenting a pure legal question as to whether that application may subsist alongside the First Amendment (see Church of St. Paul & St. Andrew v Barwick, 67 NY2d at 519; compare New York Civ. Liberties Union v Grandeau, 528 F3d at 133).
Lastly, as to the hardship prong, if the threat of enforcement were limited to their hypothetical future advocacy, then plaintiffs' anticipated harm would be too "insignificant, remote or contingent" to establish a ripe controversy (Church of St. Paul & St. Andrew v Barwick, 67 NY2d at 520; see New York Civ. Liberties Union v Grandeau, 528 F3d at 134-135). Here, however, JCOPE has already applied the challenged statute to plaintiffs' previous activity and maintains that such activity was lobbying under the Lobbying Act, creating a present threat of enforcement (compare New York Civ. Liberties Union v Grandeau, 528 F3d at 127). In view of the foregoing, plaintiffs have established a justiciable controversy as to the enforcement of the Lobbying Act with respect to their CVA activities that is ripe for review (see Adam v Barr, 792 Fed Appx 20, 21 [2d Cir 2019], cert denied ___ US ___, 140 S Ct 1119 [2020]; Mangual v Rotger-Sabat 317 F3d at 56-57). Accordingly, Supreme Court erred in granting defendants' motion to dismiss as to the second and third causes of action, and they must be reinstated.
We now move to plaintiffs' fourth cause of action, which asserts, among other things, that the regulations promulgated by JCOPE were ultra vires.[FN6] Although we agree with plaintiffs that Supreme Court, for the reasons set forth herein as to the second and third causes of action, erred in dismissing this cause of action as nonjusticiable, we must still affirm the dismissal of this cause of action based upon an alternate ground for affirmance; to wit, plaintiffs failed to state a claim inasmuch as JCOPE's authority to issue the substantive regulations is fairly implied by its existing powers. Notably, while this appeal [*13]was pending, the Ethics Commission Reform Act of 2022 was enacted (L 2022, ch 56, § 1, Part QQ).[FN7] This new legislation leaves intact the JCOPE regulations that plaintiffs argue are ultra vires and also provides JCOPE with express authority to issue new regulations (see L 2022, ch 56, § 1, Part QQ, § 2). That the Legislature left the JCOPE regulations intact and allowed additional regulations to be issued can fairly be read as the legislators' acknowledgement and reassertion of JCOPE's authority to issue those same regulations. Accordingly, we affirm the dismissal of the fourth cause of action.
Clark, J.P., Colangelo and McShan, JJ., concur.
ORDERED that the order and judgment is modified, on the law, without costs, by reversing so much thereof as granted that part of defendants' motion seeking to dismiss the second and third causes of action; motion denied to that extent; it is declared that Legislative Law art 1-A is constitutional on its face; and, as so modified, affirmed.



Footnotes

Footnote 1: We take judicial notice that, in 2022, new legislation has been enacted, but is not yet in effect as of the date of this decision, which essentially dissolves JCOPE and transfers its authority to a new body called the Commission on Ethics and Lobbying in Government (see L 2022, ch 56, § 1, Part QQ).

Footnote 2: Although they are not contained in the record on appeal, the statement pursuant to CPLR 5531 reflects that the original summons and complaint were filed in October 2019.

Footnote 3: This conclusion does not mean that the application of the statute by JCOPE is immune from constitutional challenge.

Footnote 4: Nevertheless, this issue remains quite troubling, particularly regarding JCOPE's application and enforcement of the Lobbying Act in this case, which involves so-called lobbying on one's own behalf — more often and perhaps better characterized as political activism or petitioning the government. However, the constitutional issues, including overbreadth and vagueness, are not generated by the Lobbying Act per se and would be more properly considered in an as-applied challenge.

Footnote 5: To the extent that JCOPE asserts that Police Conference of N.Y. v Kruetzer (91 AD2d 735) is controlling and supports this proposition, we disagree and find that case highly distinguishable from the instant matter.

Footnote 6: On appeal, plaintiffs have abandoned their claim, in the amended complaint, that the regulations are unconstitutionally overbroad.

Footnote 7: As of the date of this decision, the new legislation has not yet taken effect.